UNITED STATES of America

v.

Anthony PROVENZANO and Anthony Bentro, Defendants.

No. S 75 Cr. 1194.

United States District Court, S. D. New York.

Nov. 11, 1977.

Robert B. Fiske, Jr., U. S. Atty. for the Southern Dist. of New York, for the United States of America; Barbara S. Jones, Steven K. Frankel, Asst. U. S. Attys., New York City, of counsel.

Maurice Edelbaum, Jay Goldberg, New York City, for defendant Provenzano; John L. Pollok, New York City, of counsel.

Kostelanetz & Ritholz, New York City, for defendant Bentro; John J. Tigue, Jr., New York City, of counsel.

## OPINION

BONSAL, District Judge.

Defendants Provenzano and Bentro move for a dismissal of the superseding and original indictments.

This criminal proceeding has had a long and tortuous history. On December 9, 1975 an indictment was filed (75 Cr. 1194) charging the defendants Anthony Provenzano, Anthony Bentro and Lawrence Paladino with conspiracy to give or offer money in the form of kickbacks to influence the trustee of the New York State Teamsters Conference Employee Welfare and Pension Benefit Plan to approve a $2.3 million mortgage loan to the owners of the Hotel Woodstock in New York City. The Government filed a Notice of Readiness on January 29, 1976. After the usual pretrial discovery proceedings, the Government informed the Court that its principal witness, Herman Goldfarb, was suffering from a serious heart ailment and requested that the trial be postponed. On August 26, 1976, the trial date was set for November 30, 1976.

On June 22, 1976 a Grand Jury indicted the defendant Provenzano and others, charging violations of 18 U.S.C. § 1201 including conspiracy to kidnap and kidnapping for the purpose of murder "on or about June 5, 1961." This indictment was assigned to Judge Stewart (76 Cr. 580). By memorandum decision dated October 29, 1976 Judge Stewart dismissed 76 Cr. 580 as barred by the five-year statute of limitations, 18 U.S.C. § 3282, which decision was subsequently affirmed on appeal. On December 9, 1976, while the Government's appeal was pending, pursuant to a stipulation between the Government and the defendants the trial of the original indictment (75 Cr. 1194) was adjourned until after the dismissal of indictment 76 Cr. 580 had been finally upheld or until the trial of said indictment, whichever first occurred. The reason for this was the fear that the publicity engendered by trying the instant indictment first might result in prejudice either to the Government or to the defendant Provenzano in 76 Cr. 580.

With respect to the defendant Bentro, the Government originally consented to a severance because of his ill health. After further investigation, the Government moved to have Bentro again joined as a

defendant with the others, and after a hearing, the motion was granted.[1]

On September 1, 1977 a pretrial conference was held, at which the trial was scheduled for October 3, 1977.

On September 21, 1977—12 days before the scheduled trial date—a different Grand Jury handed up a superseding indictment (S 75 Cr. 1194) which changed the status of Paladino from a defendant to an unindicted co-conspirator, added three other names as unindicted co-conspirators who had not been named in the original indictment, and made substantial revisions in the form of the indictment. The remaining defendants, Provenzano and Bentro, moved to adjourn the scheduled trial. After hearing argument on September 27, 1977, the Court concluded that owing to the superseding indictment the interests of justice required another adjournment, and the trial date was adjourned to November 3, 1977.

On November 3, 1977, the morning of the trial, at approximately 8:15 a. m., Mr. Edelbaum, attorney for the defendant Provenzano, appeared in chambers with a copy of a letter dated October 7, 1977 from the principal Government witness, Herman Goldfarb, to Assistant United States Attorney Barbara Jones, stating that he had received a copy of the letter the day before from the U.S. Attorney's Office as *Brady* material. A copy of this letter is attached to this opinion.

In the letter, Mr. Goldfarb stated that he had told Mr. Aronwald (then Attorney-in-Charge of the Justice Department's Organized Crime Strike Force for the Southern District of New York) that the Government didn't have a case against Provenzano and that he had not been looking at Mr. Provenzano when the allegedly incriminating statement on the kickback ("we got to give Rocky ten") was made at his July 11, 1974 meeting with both defendants. (This was the only meeting of the many mentioned in the indictment where Mr. Provenzano was present.) He further stated that Mr. Aronwald had assured him that a verification of the tape made of Mr. Provenzano's voice had come back positive and that Goldfarb's "statement to the Grand Jury would be proper."[2]

The jury panel (the jury having been ordered sequestered) was not brought up to the courtroom so that the defendants could make motions to dismiss the indictment because of the contents of Goldfarb's letter. After reading the Grand Jury minutes *in camera*, the Court denied the motions since the matter appeared primarily to go to the question of Goldfarb's credibility. However, the defendants' attorneys were permitted to interrogate Mr. Goldfarb without the presence of the Government. *Gregory v. United States*, 125 U.S.App.D.C. 140, 143, 369 F.2d 185, 188 (1966); *Coppolino v. Helpern*, 266 F.Supp. 930, 935 (S.D.N.Y.1967). This interrogation took place the same afternoon, Goldfarb having consented thereto and being accompanied by his lawyer. Following their interrogation, and on the same afternoon, defendants Provenzano and Bentro renewed their motions to dismiss the indictment on the basis of the information obtained by them from Goldfarb. Following the defendants' presentation, the hearing was adjourned until the following morning to give the Government an opportunity to respond.

The following morning, November 4, the Government argued in opposition to the defendants' motions, again urging that the indictments were proper and that the only

1. A hearing was conducted in August, 1977 before Judge Owen with respect to Bentro's physical condition and he found that Bentro was able to stand trial. The docket entries indicate that an appeal was taken from Judge Owen's decision, which was either withdrawn or remains undetermined.

2. Goldfarb had been a Government informer set up in business by the Government for the purpose of investigating crime. He was a participant in "Operation Cleveland," and recent publicity discloses that he has been angry at the treatment accorded to him by the Government (N.Y. Times, Sept. 9, 1977, at B1).

As part of his undercover role, Mr. Goldfarb concealed a tape recorder and taped the meeting of July 11, 1974 at which at least six persons were said to have been present, including the defendants.

matters which had been raised involved credibility, which was for the jury to determine. The Court reserved on the defendants' motions and directed a brief evidentiary hearing, which was held the same morning. At the hearing, which was held in open court, Aronwald, who had represented the Government before the Grand Jury in connection with the original indictment, and Goldfarb, both testified. Thereafter, the parties submitted briefs in connection with the motions to dismiss, and argument thereon was held on the morning of November 9, 1977.

The *in camera* examination of the Grand Jury testimony established that the superseding indictment was based in large part on the transcript of Goldfarb's testimony before the first Grand Jury in December 1975. It seemed to the Court that the Government knew, or should have known, at the time of the superseding indictment that Goldfarb had, to a great degree, recanted his prior testimony given to the first Grand Jury. Moreover, the testimony at the hearing satisfies the Court (1) that Goldfarb had never met or seen Provenzano until the July 11, 1974 meeting, and (2) that a number of matters were discussed at this meeting involving not only the Hotel Woodstock but other deals and Goldfarb was unsure whether the statement as to the alleged kickback was in connection with the proposed Hotel Woodstock loan.

Following the argument, the Court indicated to counsel that it would dismiss the superseding indictment and would give further consideration to the motion of the defendants to dismiss the original 1975 indictment as well.

■ The Fifth Amendment of the United States Constitution guarantees that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." The Supreme Court has repeatedly emphasized that this "constitutional guarantee presupposes an investigative body 'acting independently of either prosecuting attorney or judge.'" *United States v. Dionisio,* 410 U.S. 1, 16, 93 S.Ct. 764, 773, 35

L.Ed.2d 67 (1972), *quoting Stirone v. United States,* 361 U.S. 212, 218, 80 S.Ct. 270, 4 L.Ed.2d 252 (1959). "[T]he institution [of the grand jury] . . . is designed as a means, not only of bringing to trial persons accused of public offenses upon just grounds, but also as a means of protecting the citizen against unfounded accusation, whether it comes from government, or be prompted by partisan passion or private enmity." *Ex parte Bain,* 121 U.S. 1, 11, 7 S.Ct. 781, 786, 30 L.Ed. 849 (1887) (quoting grand jury charge of Mr. Justice Field); *accord, Wood v. Georgia,* 370 U.S. 375, 390, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962).

Unfortunately, many commentators feel that the Grand Jury has lost its independence and has become a rubber stamp for prosecutors, no longer providing the protection the framers of the Fifth Amendment had contemplated. Recently, however, the courts have sought to restore this "protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor." *United States v. Dionisio, supra* at 16–17, 93 S.Ct. at 773. And the Second Circuit has taken the lead.

Aware of its potential to mislead a Grand Jury, this Circuit has condemned prosecutors' undue reliance upon hearsay before a Grand Jury, particularly where the prosecutor has deceived the grand jurors as to "the shoddy merchandise" they are receiving or where the case involves "a high probability that with eyewitness rather than hearsay testimony the grand jury would not have indicted." *United States v. Estepa,* 471 F.2d 1132, 1137 (2d Cir. 1972), *quoting United States v. Leibowitz,* 420 F.2d 39, 42 (2d Cir. 1969). In its attempt to insure the right of the accused "to have the grand jury make the charge on its own judgment," *Stirone v. United States, supra* at 219, 80 S.Ct. at 274, this Circuit has directed that hearsay evidence only be used "when direct testimony is unavailable or when it is demonstrably inconvenient to summon witnesses able to testify to facts from personal knowledge." *United States v. Umans,* 368 F.2d 725, 730 (2d Cir. 1966).

## THE SUPERSEDING INDICTMENT

Defendants have moved to dismiss the superseding indictment on the grounds that it was presented with hearsay evidence in violation of the chain of decisions culminating with *United States v. Estepa, supra.* The circumstances surrounding the return of the superseding indictment persuade the Court to agree.

In obtaining the superseding indictment, the Government utilized the 22-month-old and somewhat dubious Grand Jury testimony of Mr. Goldfarb, even though Goldfarb was in protective custody and available to testify. According to his October 7, 1977 letter to Assistant United States Attorney Ms. Jones, Mr. Goldfarb had expressed his doubts to the Government about the viability of its case against Provenzano before the superseding indictment was obtained. Moreover, at the November 4th hearing, Mr. Goldfarb repeatedly explained that he was not certain but only believed circumstantially of the accuracy of his identification of Mr. Provenzano at the July 11, 1974 meeting. The Government denies that Mr. Goldfarb ever expressed any hesitancy as to his identification of Mr. Provenzano.

In the fall of 1976, prior to the return of the superseding indictment, Mr. Goldfarb had been the Government's chief witness in the trial of *United States v. Wolf, et al.* (75 Cr. 984) before Judge Ward. Following a six-week trial with a sequestered jury, all the defendants on trial were acquitted, indicating difficulties with Mr. Goldfarb's credibility. Moreover, the Government does not deny that Mr. Goldfarb discussed this case at length with them during the summer of 1977 before the superseding indictment was returned.

Under these circumstances, the Government was either aware or should have been aware of the unreliability of Mr. Goldfarb's prior testimony. Nonetheless, instead of producing Mr. Goldfarb before the Grand Jury to enable the grand jurors to "make the charge on its own judgment," *Stirone v. United States, supra* at 219, 80 S.Ct. at 274, the Government chose to place his prior testimony before the Grand Jury,

misleading the grand jurors as to "the shoddy merchandise" they were getting. In *United States v. Pastor,* 419 F.Supp. 1318 (S.D.N.Y.1975), a narcotics prosecution, Judge Motley dismissed a superseding indictment which was based upon both a witness's live testimony and the transcript of his prior testimony since the live testimony dealt with only one of the ten narcotics transactions involved. Judge Motley ruled:

> "In failing to advise the Grand Jury that it could question Mr. Fernald [the witness] regarding his prior testimony or have him testify before them as to those transactions, the Grand Jury which returned the superseding indictment may well have been misled as to 'the shoddy merchandise they [were] getting so they [could] seek something better if they wished.'" [Citation omitted.] *Id.* at 1324.

Here, where the Government was aware, or certainly should have been, that their key witness recanted his prior testimony, the use of his 22-month-old testimony misled the Grand Jury, depriving them of an opportunity to make an independent evaluation of the case. Accordingly, the motions to dismiss the superseding indictment are granted.

## THE ORIGINAL INDICTMENT

Before Mr. Goldfarb testified before the Grand Jury in December, 1975, Mr. Aronwald testified that he sent the tapes of Mr. Goldfarb's July 11, 1974 meeting to the F.B.I. to verify Mr. Provenzano's voice. Mr. Goldfarb, who had not been looking at Mr. Provenzano when the allegedly incriminating statement was made on the kickback and who had been having some doubts as to his identification of the defendant whom he had only then met, felt reassured when Mr. Aronwald reported to him that the tapes had come back positive. Aronwald himself testified that he had had the voice verified because of his circumspection in proceeding with a "one-witness identification case":

> "THE COURT: . . . I'd like to ask you this, you did tell Mr. Goldfarb about the FBI identification.

Is that your practice—was that your practice when you had a problem like this?

MR. ARONWALD: I believe in this case, your Honor, Mr. Goldfarb—I originally indicated to Mr. Goldfarb that I was circumspect about the case because it was basically a one-witness identification case, because the surveillance had failed to produce any evidence establishing Mr. Provenzano's being in that building on that date, and thereafter, after I had sent—in fact, I believe I had told Mr. Goldfarb that I was going to send the tapes for a voice identification and thereafter reported back to him what the results were.

The reason for telling him about the voice identification was because on a previous occasion I had indicated some difficulty with the case, because I didn't want to proceed on a one-witness identification case." (Tr. 55)

Mr. Goldfarb testified that he had voiced his concern about the viability of the Government's case to Mr. Aronwald and was told that it was none of his business. Aronwald testified as follows:

"THE COURT: . . . did you ever tell Mr. Goldfarb that something wasn't any of his business?

MR. ARONWALD: Yes.

THE COURT: Did it happen quite frequently?

MR. ARONWALD: With Mr. Goldfarb, yes, it did." (Tr. 48–9)

■ In this concededly one-witness identification case, this disregard for further facts bearing on the viability of the prosecution's case deprived the Grand Jury of an opportunity to evaluate all the evidence in determining whether to return an indictment. In *United States v. Phillips Petroleum Co.,* 435 F.Supp. 610, 621 (N.D.Okl.1977), the district court concluded that where "a witness appeared before the Grand Jury and gave testimony which, in the absence of explanation, must have been considered incriminating, and subsequently, in recorded testimony before the prosecutor, gave an exculpatory explanation, it is a violation of due process and an abuse of the Grand Jury to withhold that testimony from the Grand Jury." In the instant case, at a minimum, there was a disregard of concerns expressed by the one eyewitness without whom there could be no indictment. Under the totality of the circumstances of this case, the Grand Jury could not perform its function to protect citizens against unfounded accusations. *Ex parte Bain, supra.*

The foregoing constituted an abuse of the Grand Jury and requires the dismissal of the indictment as to defendants Provenzano and Bentro. *See United States v. Phillips, supra; United States v. Pastor, supra* at 1324.[3]

As stated by Judge Tyler in *United States v. Filippatos,* 307 F.Supp. 564, 565 (S.D.N.Y.1969):

"Though the indictment of the grand jury is no more than an accusation bearing no evidentiary value at trial and does not in any way change the presumption of the defendant's innocence, there can be no doubt that an indictment by a grand jury places on a defendant the heavy burdens of expending time, energy, and capital in the defense of his case and almost certainly of meeting the social opprobrium that shadows him while under the charge of the indictment. In addition, trial of charges brought without a sufficiently solid basis is wasteful of the courts' time and an improper abuse of public funds."

This is such a case. In view of Goldfarb's statements in this one-witness identification case, it is hard for the Court to see how at trial a reasonable juror could find that the Government had proved its case beyond a reasonable doubt.

The motions to dismiss the original and the superseding indictments are granted without prejudice to the Government seeking a new indictment if it is so advised.

It is so ordered.

---

**3.** The use of Mr. Goldfarb's testimony from the first indictment also "poisoned the waters of evidence" upon which the superseding one was based. For this reason also, the superseding indictment must be dismissed. *United States v. Gallo,* 394 F.Supp. 310, 315 (D.Conn.1975).

Appendix

October 7, 1977

Ms. Barbara Jones
Assistant U. S. Attorney
One St. Andrews Plaza, Rm. 824
New York, New York 10007

Dear Barbara:

Please excuse the emotional state I was in when we talked this week. As I stated, receiving two pieces of bad news these days are hardly something I could be restrained and "cool".

I suppose losing ones sight should "break" a person up. However, I can live with that—if—everything else is in order. When you consider that I have a long way to go to accomplish this, it does "break" me up. Especially so when the second "flash" is on course. That is, Mr. Flaherty's refusal to resolve my problems with Mr. Walinsky, without a battle. For this I certainly require ALL of my faculties.

If you stop and think—it was the Marshal Service, Bill Aronwald, Mike Eberhardt, Mr. Miller (Deputy Attorney General), Mr. Scher, Mr. Joyce, Mr. Civiletti, and now Mr. Flaherty—all initially abhorred by the treatment, the negligence and the ineptitude of those involved in resolving the problems created by the U. S. Department of Justice. As John Partington stated, "I was a special case, as I had volunteered, and I would be taken care of".

Couple, this with these facts. I went to prison for something I did not do. When Judge Ward presided over the last trial, Mr. Edelbaum had the "original" minutes of my case. I commented to Judge Ward as to the fact that "Edelbaum had the originals". Judge Ward was surprised. I have been deprived recently of a total of $165,000.00. And you know the former F.B.I. Agent who can attest to that. The District Attorney refuses to take the complaint until his investigators can establish "intent to defraud". That is several months ago—however—the word "intent" never entered my case. I was promptly arrested and railroaded into jail. There existed a business deal with the "writer of the check", when the deal was exposed to the senior partner. All hell broke loose. They took back in addition to the payments the balance of the money due on two loans, on mine, I was arrested. Judge Liebowitz gave Mr. Hoey two weeks to return a corrected indictment, or I would be turned loose. *Those were the words stated by Liebowitz.* Two weeks later, the indictment remained the same and I had a lunatic on the bench, threatening me he would send me to jail for a lot more time if I fought the case. At the same time Hoey had his forefinger extended, cocking his thumb, indicating a gun being fired. Now try to understand this Barbara, I would have to fight Judge Liebowitz, Hoey (who subsequently became a U. S. Attorney), my Attorney Judge Aaron Goldstein, Senator Herbert Tenzer (the senior partner) and Judge Silver. That is a line-up I could ill-afford to come up against. So, I turned to the Department of Justice, thinking they would examine the case. The second charge with the girl. P. O. Mike Sullivan saw the area in which the girl stated I fondled her. He laughed!! The area was 16 inches wide. My waist was 40 inches, my chest is 49 inches. No way under God's heaven could two people stand either side by side or facing each other (which position she claimed we were in). I put on the witness stand a woman (whom we traced through her credit card purchase), a young girl, a former New Jersey police officer, and a woman who was the secretary to Judge Griffin, a presiding Judge in the next courtroom. *All testified the girl never left the front of the store* to go in the back where the alleged incident occurred. Judge Griffin, whom I did not know, approached me and placed his arm about my shoulders and told me he couldn't understand Judge Morrison's verdict of guilty. His secretary was crying hysterically, to think her testimony would not be accepted. (She evidently knew Judge Morrison, a real estate attorney that was given a criminal Judgeship.) The funny

part is, the case before mine he dismissed a felony gun charge against an attorney, who threatened two black attendants, with a loaded gun, working in a dog grooming establishment, because they told the attorney's wife she did not leave the leash for her dog with them.

The third charge on which I was ordered to pay a claimant back $1,000.00 for theft of services, is a dilly. I never wrote the check, signed the check, or was an officer or director of the Corporation that issued that check. The secretary of the Corporation gave a signed statement to the effect that *she gave the check to this fellow 8 days before the effective date on the check*. The Judge would not accept that testimony. Neither would he accept a sworn deposition from both a defendant and a former assistant district attorney in Miami Beach, that I was in Miami Beach until 4 p. m. Sunday and commenced to *drive* back to New York shortly after taking my deposition. The check was deposited on Monday at 9 a. m. The charge against me was—I gave that check for $1,000.00 to the Plaintiff on Monday at 8:30 a. m. How in hell, could that be—drive 1,500 miles in 16 hours!! Anyways, in retrospect, I saw the injury and the degradation I had to endure, because of inside deals, made by over-zealous, supposedly law-enforcement people. This prompted me to tell Bill Aronwald, I felt he did not have a case against Anthony Provenzano. (I told you the same.) I told Aronwald the following:

1. I was not looking at Provenzano when the remark to the effect "we got to give Rocky 10". I assumed it was Mr. Provenzano talking (only thru the process of elimination). Aronwald assured me that those words were uttered by Provenzano, that he (Aronwald) had sent the tape out for voice identification and it came back positive. I took his word and he convinced me that my statement to the Grand Jury would be proper. Keep in mind, NO ONE BOTHERED TO ASK ME IF I WAS LOOKING DIRECTLY AT PROVENZANO. Aronwald lied, he never had the tape verified for voice identification.

2. I never met Provenzano before July 11, 1974. I wouldn't know him if I passed him in the street.

3. The transcript of that day—stinks—. You, Barbara told me you had two transcripts that differed and stunk. You then called me and told me Ginsburg straightened out the tape and now you have a third version.

You asked me if I had papers with me when I entered the meeting that day. I told you I couldn't recall—however—I did tell you that there was an F.B.I. Agent in the lobby taking pictures of myself and Larry Paladino. Where are they? Everytime I talk to you Barbara, you tell me that you found more tapes, *that were never transcribed*, that have additional information. Barbara, I med [sic] Provenzano, once, what in God's name could you find that would only confuse me more—and place myself in Provenzano's place. Din't [sic] you see—I am Provenzano—what happened to me as I mentioned previously—is happening to Provenzano.

Perhaps, I am not making myself clear, I promised you I will be at the trial. And I will testify to the best of my knowledge what transpired. I have always done that—despite the ravings of Judge Frankel and those who refer to me as a sleazy—cadavertype. Let those good puritanical citizens sit on a witness stand, as I did in Judge Ward's courtroom—a couple of months after open-heart surgery, with my chest open from a 14 inch incision. Every night I had to rinse the *open* incision with peroxide, and in the morning tape my chest up so I wouldn't bleed. I went to the extreme of wearing a tight vest to hold my chest together. Of course Judge Ward asked me to speak up—I was hurting—but as I told Judge Ward—I would testify because every person deserves their rightful day in court.

Barbara, I have never said anything to anyone in the Department of Justice, that I did not immediately say, verify same. You know, no one has taken me up on

that, the reason being, they will find I was truthful—and *that*, they couldn't cope with.

I am sorry for any inconvenience I may have caused you or the Court, but it is my duty to help myself and my family in these desperate hours of illness and mental anguish. In view of the broken promises to me, I don't owe the Department of Justice anything. Perhaps, to testify, as I have been entrapped to do so, by virtue of those broken promises.

And frankly, Barbara, when it's all over, I pray to see my children and grandchildren ensconced—and then gladly would I die.

[S] Herman Goldfarb