## UNITED STATES *v.* DIONISIO

No. 71–229.   Argued November 6, 1972—Decided January 22, 1973

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, *post*, p. 22. DOUGLAS, J., *post*, p. 23, and MARSHALL, J., *post*, p. 31, filed dissenting opinions.

*Philip A. Lacovara* argued the cause for the United States. On the brief were *Solicitor General Griswold, Assistant Attorney General Petersen, Wm. Bradford Reynolds, Beatrice Rosenberg,* and *Sidney M. Glazer.*

*John Powers Crowley* argued the cause and filed a brief for respondent.

MR. JUSTICE STEWART delivered the opinion of the Court.

A special grand jury was convened in the Northern District of Illinois in February 1971, to investigate possible violations of federal criminal statutes relating to gambling. In the course of its investigation, the grand jury received in evidence certain voice recordings that had been obtained pursuant to court orders.[1]

---

[1] The court orders were issued pursuant to 18 U. S. C. § 2518, a statute authorizing the interception of wire communications upon a judicial determination that "(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter [including the transmission of wagering information];

The grand jury subpoenaed approximately 20 persons, including the respondent Dionisio, seeking to obtain from them voice exemplars for comparison with the recorded conversations that had been received in evidence. Each witness was advised that he was a potential defendant in a criminal prosecution. Each was asked to examine a transcript of an intercepted conversation, and to go to a nearby office of the United States Attorney to read the transcript into a recording device. The witnesses were advised that they would be allowed to have their attorneys present when they read the transcripts. Dionisio and other witnesses refused to furnish the voice exemplars, asserting that these disclosures would violate their rights under the Fourth and Fifth Amendments.

The Government then filed separate petitions in the United States District Court to compel Dionisio and the other witnesses to furnish the voice exemplars to the grand jury. The petitions stated that the exemplars were "essential and necessary" to the grand jury investigation, and that they would "be used solely as a standard of comparison in order to determine whether or not the witness is the person whose voice was intercepted . . . ."

Following a hearing, the District Judge rejected the witnesses' constitutional arguments and ordered them to comply with the grand jury's request. He reasoned that voice exemplars, like handwriting exemplars or fingerprints, were not testimonial or communicative evidence, and that consequently the order to produce them would

---

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception; (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; (d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person."

4

not compel any witness to testify against himself. The District Judge also found that there would be no Fourth Amendment violation, because the grand jury subpoena did not itself violate the Fourth Amendment, and the order to produce the voice exemplars would involve no unreasonable search and seizure within the proscription of that Amendment:

> "The witnesses are lawfully before the grand jury pursuant to subpoena. The Fourth Amendment prohibition against unreasonable search and seizure applies only where identifying physical character-istics, such as fingerprints, are obtained as a result of unlawful detention of a suspect, or when an in-trusion into the body, such as a blood test, is under-taken without a warrant, absent an emergency situation. *E. g., Davis* v. *Mississippi,* 394 U. S. 721, 724–728 (1969); *Schmerber* v. *California,* 384 U. S. 757, 770–771 (1966)." [2]

When Dionisio persisted in his refusal to respond to the grand jury's directive, the District Court adjudged him in civil contempt and ordered him committed to custody until he obeyed the court order, or until the expiration of 18 months.[3]

The Court of Appeals for the Seventh Circuit reversed. 442 F. 2d 276. It agreed with the District Court in rejecting the Fifth Amendment claims,[4] but concluded that to compel the voice recordings would violate the Fourth Amendment. In the court's view, the grand

---

[2] The decision of the District Court is unreported.

[3] The life of the special grand jury was 18 months, but could be extended up to an additional 18 months. 18 U. S. C. § 3331.

[4] The court also rejected the argument that the grand jury procedure violated the witnesses' Sixth Amendment right to counsel. It found the contention particularly without merit in view of the option afforded the witnesses to have their attorneys present while they made the voice recordings. 442 F. 2d 276, 278.

jury was "seeking to obtain the voice exemplars of the witnesses by the use of its subpoena powers because probable cause did not exist for their arrest or for some other, less unusual, method of compelling the production of the exemplars." *Id.*, at 280. The court found that the Fourth Amendment applied to grand jury process, and that "under the fourth amendment law enforcement officials may not compel the production of physical evidence absent a showing of the reasonableness of the seizure. Davis v. Mississippi, 394 U. S. 721 . . . ." *Ibid.*

In *Davis* this Court held that it was error to admit the petitioner's fingerprints into evidence at his trial for rape, because they had been obtained during a police detention following a lawless wholesale roundup of the petitioner and more than 20 other youths. Equating the procedures followed by the grand jury in the present case to the fingerprint detentions in *Davis*, the Court of Appeals reasoned that "[t]he dragnet effect here, where approximately twenty persons were subpoenaed for purposes of identification, has the same invidious effect on fourth amendment rights as the practice condemned in *Davis*." *Id.*, at 281.

In view of a clear conflict between this decision and one in the Court of Appeals for the Second Circuit,[5] we granted the Government's petition for certiorari. 406 U. S. 956.

I

The Court of Appeals correctly rejected the contention that the compelled production of the voice exemplars would violate the Fifth Amendment. It has long been held that the compelled display of identifiable physical characteristics infringes no interest protected by

---

[5] *United States* v. *Doe* (*Schwartz*), 457 F. 2d 895 (affirming civil contempt judgment against grand jury witness for refusal to furnish handwriting exemplars).

the privilege against compulsory self-incrimination. In *Holt* v. *United States,* 218 U. S. 245, 252, Mr. Justice Holmes, writing for the Court, dismissed as an "extravagant extension of the Fifth Amendment" the argument that it violated the privilege to require a defendant to put on a blouse for identification purposes. He explained that "the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." *Id.,* at 252–253.

More recently, in *Schmerber* v. *California,* 384 U. S. 757, we relied on *Holt,* and noted that:

> "[B]oth federal and state courts have usually held that [the privilege] offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it." *Id.,* at 764 (footnote omitted).

The Court held that the extraction and chemical analysis of a blood sample involved no "shadow of testimonial compulsion upon or enforced communication by the accused." *Id.,* at 765.

These cases led us to conclude in *Gilbert* v. *California,* 388 U. S. 263, that handwriting exemplars were not protected by the privilege against compulsory self-incrimination. While "[o]ne's voice and handwriting are, of course, means of communication," we held that a "mere handwriting exemplar, in contrast to the content of what

is written, like the voice or body itself, is an identifying physical characteristic outside its protection." *Id.,* at 266–267. And similarly in *United States* v. *Wade,* 388 U. S. 218, we found no error in compelling a defendant accused of bank robbery to utter in a lineup words that had allegedly been spoken by the robber. The accused there was "required to use his voice as an identifying physical characteristic, not to speak his guilt." *Id.,* at 222–223.

*Wade* and *Gilbert* definitively refute any contention that the compelled production of the voice exemplars in this case would violate the Fifth Amendment. The voice recordings were to be used solely to measure the physical properties of the witnesses' voices, not for the testimonial or communicative content of what was to be said.[6]

---

[6] The Court of Appeals for the Seventh Circuit appears to have recanted somewhat from its clear and correct holding in the present case that the compelled production of voice exemplars would not violate the privilege against compulsory self-incrimination. In subsequently explaining that holding, the Court qualified it:

"Nevertheless, the witnesses were potential defendants, and since the purpose of the voice exemplars was to identify the voices obtained by FBI agents pursuant to a court-ordered wiretap, the self-incriminatory impact of the compelled exemplars was clear. Thus the compelled exemplars were at odds with the spirit of the Fifth Amendment. Because the Fifth Amendment illuminates the Fourth (see . . . Boyd v. United States [116 U. S. 616] . . .), the Fourth Amendment violation appears more readily than where immunity is granted, and in *Dionisio* immunity had not yet been granted." *Fraser* v. *United States,* 452 F. 2d 616, 619 n. 5.

But *Boyd* dealt with the compulsory production of private books and records, testimonial sources, a circumstance in which the "Fourth and Fifth Amendments run almost into each other." 116 U. S., at 630. In the present case, by contrast, no Fifth Amendment interests are jeopardized; there is no hint of testimonial compulsion. The Court of Appeals' subsequent attempt to read the "spirit of the Fifth Amendment" into the production of voice exemplars cannot survive comparison with *Wade, Gilbert,* and *Schmerber.*

## II

The Court of Appeals held that the Fourth Amendment required a preliminary showing of reasonableness before a grand jury witness could be compelled to furnish a voice exemplar, and that in this case the proposed "seizures" of the voice exemplars would be unreasonable because of the large number of witnesses summoned by the grand jury and directed to produce such exemplars. We disagree.

The Fourth Amendment guarantees that all people shall be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." Any Fourth Amendment violation in the present setting must rest on a lawless governmental intrusion upon the privacy of "persons" rather than on interference with "property relationships or private papers." *Schmerber* v. *California,* 384 U. S., at 767; see *United States* v. *Doe (Schwartz),* 457 F. 2d 895, 897. In *Terry* v. *Ohio,* 392 U. S. 1, the Court explained the protection afforded to "persons" in terms of the statement in *Katz* v. *United States,* 389 U. S. 347, that "the Fourth Amendment protects people, not places," *id.,* at 351, and concluded that "wherever an individual may harbor a reasonable 'expectation of privacy,' . . . he is entitled to be free from unreasonable governmental intrusion." *Terry* v. *Ohio, supra,* at 9.

As the Court made clear in *Schmerber, supra,* the obtaining of physical evidence from a person involves a potential Fourth Amendment violation at two different levels—the "seizure" of the "person" necessary to bring him into contact with government agents, see *Davis* v. *Mississippi,* 394 U. S. 721, and the subsequent search for and seizure of the evidence. In *Schmerber,* we found the initial seizure of the accused justified as a lawful arrest, and the subsequent seizure of the blood sample from his body reasonable in light of the exigent cir-

cumstances. And in *Terry*, we concluded that neither the initial seizure of the person, an investigatory "stop" by a policeman, nor the subsequent search, a "patdown" of his outer clothing for weapons, constituted a violation of the Fourth and Fourteenth Amendments. The constitutionality of the compulsory production of exemplars from a grand jury witness necessarily turns on the same dual inquiry—whether either the initial compulsion of the person to appear before the grand jury, or the subsequent directive to make a voice recording is an unreasonable "seizure" within the meaning of the Fourth Amendment.

It is clear that a subpoena to appear before a grand jury is not a "seizure" in the Fourth Amendment sense, even though that summons may be inconvenient or burdensome. Last Term we again acknowledged what has long been recognized,[7] that "[c]itizens generally are not constitutionally immune from grand jury subpoenas . . . ." *Branzburg* v. *Hayes*, 408 U. S. 665, 682. We concluded that:

> "Although the powers of the grand jury are not unlimited and are subject to the supervision of a judge, the longstanding principle that 'the public . . . has a right to every man's evidence,' except for those persons protected by a constitutional, common-law, or statutory privilege, *United States* v. *Bryan*, 339 U. S., at 331; *Blackmer* v. *United States*, 284 U. S. 421, 438 (1932); 8 J. Wigmore, Evidence § 2192 (McNaughton rev. 1961), is particularly applicable to grand jury proceedings." *Id.*, at 688.

These are recent reaffirmations of the historically grounded obligation of every person to appear and give

---

[7] See generally *Kastigar* v. *United States*, 406 U. S. 441, 443–444; *Blair* v. *United States*, 250 U. S. 273, 279–281; 8 J. Wigmore, Evidence § 2191 (J. McNaughton rev. 1961).

his evidence before the grand jury. "The personal sacrifice involved is a part of the necessary contribution of the individual to the welfare of the public." *Blair* v. *United States,* 250 U. S. 273, 281. See also *Garland* v. *Torre,* 259 F. 2d 545, 549. And while the duty may be "onerous" at times, it is "necessary to the administration of justice." *Blair* v. *United States, supra,* at 281.[8]

The compulsion exerted by a grand jury subpoena differs from the seizure effected by an arrest or even an investigative "stop" in more than civic obligation. For, as Judge Friendly wrote for the Court of Appeals for the Second Circuit:

> "The latter is abrupt, is effected with force or the threat of it and often in demeaning circumstances, and, in the case of arrest, results in a record involving social stigma. A subpoena is served in the same manner as other legal process; it involves no stigma whatever; if the time for appearance is inconvenient, this can generally be altered; and it remains at all times under the control and supervision of a court." *United States* v. *Doe (Schwartz)* 457 F. 2d, at 898.

Thus, the Court of Appeals for the Seventh Circuit correctly recognized in a case subsequent to the one now before us, that a "grand jury subpoena to testify is not that kind of governmental intrusion on privacy against which the Fourth Amendment affords protection, once the Fifth Amendment is satisfied." *Fraser* v. *United States,* 452 F. 2d 616, 620; cf. *United States* v. *Weinberg,* 439 F. 2d 743, 748–749.

---

[8] The obligation to appear is no different for a person who may himself be the subject of the grand jury inquiry. See *United States* v. *Doe (Schwartz),* 457 F. 2d, at 898; *United States* v. *Winter,* 348 F. 2d 204, 207–208.

This case is thus quite different from *Davis* v. *Mississippi, supra,* on which the Court of Appeals primarily relied. For in *Davis* it was the initial seizure—the lawless dragnet detention—that violated the Fourth and Fourteenth Amendments, not the taking of the fingerprints. We noted that "[i]nvestigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention," 394 U. S., at 726, and we left open the question whether, consistently with the Fourth and Fourteenth Amendments, narrowly circumscribed procedures might be developed for obtaining fingerprints from people when there was no probable cause to arrest them. *Id.,* at 728.[9] *Davis* is plainly inapposite to a case where the initial restraint does not itself infringe the Fourth Amendment.

This is not to say that a grand jury subpoena is some talisman that dissolves all constitutional protections. The grand jury cannot require a witness to testify against himself. It cannot require the production by a person of private books and records that would incriminate him. See *Boyd* v. *United States,* 116 U. S. 616, 633–635.[10] The Fourth Amendment provides protection against a grand jury subpoena *duces tecum* too sweeping in its terms "to be regarded as reasonable." *Hale* v.

[9] Judge Weinfeld correctly characterized *Davis* as "but another application of the principle that the Fourth Amendment applies to all searches and seizures of the person no matter what the scope or duration. It held that in the circumstances there presented the detention for the sole purpose of fingerprinting was in violation of the Fourth Amendment ban against unreasonable search and seizure." *Thom* v. *New York Stock Exchange,* 306 F. Supp. 1002, 1007 (footnote omitted). See also *Allen* v. *Cupp,* 426 F. 2d 756, 760.

[10] While *Boyd* was concerned with a motion to produce invoices at a forfeiture trial, the Court treated it as the equivalent of a subpoena *duces tecum,* and *Hale* v. *Henkel,* 201 U. S. 43, 76, applied *Boyd* in the context of a grand jury subpoena.

*Henkel,* 201 U. S. 43, 76; cf. *Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S. 186, 208, 217. And last Term, in the context of a First Amendment claim, we indicated that the Constitution could not tolerate the transformation of the grand jury into an instrument of oppression: "Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification. Grand juries are subject to judicial control and subpoenas to motions to quash. We do not expect courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth." *Branzburg* v. *Hayes,* 408 U. S., at 707–708. See also, *id.,* at 710 (POWELL, J., concurring).

But we are here faced with no such constitutional infirmities in the subpoena to appear before the grand jury or in the order to make the voice recordings. There is, as we have said, no valid Fifth Amendment claim. There was no order to produce private books and papers, and no sweeping subpoena *duces tecum.* And even if *Branzburg* be extended beyond its First Amendment moorings and tied to a more generalized due process concept, there is still no indication in this case of the kind of harassment that was of concern there.

The Court of Appeals found critical significance in the fact that the grand jury had summoned approximately 20 witnesses to furnish voice exemplars.[11] We think that fact is basically irrelevant to the constitutional issues here. The grand jury may have been attempting to

---

[11] As noted *supra,* at 11, there is no valid comparison between the detentions of the 24 youths in *Davis,* and the grand jury subpoenas of the witnesses here. While the dragnet detentions by the police did constitute substantial intrusions into the Fourth and Fourteenth Amendment rights of each of the youths in *Davis,* no person has a justifiable expectation of immunity from a grand jury subpoena.

identify a number of voices on the tapes in evidence, or it might have summoned the 20 witnesses in an effort to identify one voice. But whatever the case, "[a] grand jury's investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed . . . ." *United States* v. *Stone,* 429 F. 2d 138, 140. See also *Wood* v. *Georgia,* 370 U. S. 375, 392. As the Court recalled last Term, "Because its task is to inquire into the existence of possible criminal conduct and to return only well-founded indictments, its investigative powers are necessarily broad." *Branzburg* v. *Hayes, supra,* at 688.[12] The grand jury may well find it desirable to call numerous witnesses in the course of an investigation. It does not follow that each witness may resist a subpoena on the ground that too many witnesses have been called. Neither the order to Dionisio to appear nor the order to make a voice recording was rendered unreasonable by the fact that many others were subjected to the same compulsion.

But the conclusion that Dionisio's compulsory appearance before the grand jury was not an unreasonable "seizure" is the answer to only the first part of the Fourth Amendment inquiry here. Dionisio argues that the grand jury's subsequent directive to make the voice recording was itself an infringement of his rights

---

[12] "[The grand jury] is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime. As has been said before, the identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning. *Hendricks* v. *United States,* 223 U. S. 178, 184." *Blair* v. *United States,* 250 U. S., at 282.

under the Fourth Amendment. We cannot accept that argument.

In *Katz* v. *United States, supra,* we said that the Fourth Amendment provides no protection for what "a person knowingly exposes to the public, even in his own home or office . . . ." 389 U. S., at 351. The physical characteristics of a person's voice, its tone and manner, as opposed to the content of a specific conversation, are constantly exposed to the public. Like a man's facial characteristics, or handwriting, his voice is repeatedly produced for others to hear. No person can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world. As the Court of Appeals for the Second Circuit stated:

> "Except for the rare recluse who chooses to live his life in complete solitude, in our daily lives we constantly speak and write, and while the content of a communication is entitled to Fourth Amendment protection . . . the underlying identifying characteristics—the constant factor throughout both public and private communications—are open for all to see or hear. There is no basis for constructing a wall of privacy against the grand jury which does not exist in casual contacts with strangers. Hence no intrusion into an individual's privacy results from compelled execution of handwriting or voice exemplars; nothing is being exposed to the grand jury that has not previously been exposed to the public at large." *United States* v. *Doe (Schwartz),* 457 F. 2d, at 898–899.

The required disclosure of a person's voice is thus immeasurably further removed from the Fourth Amendment protection than was the intrusion into the body effected by the blood extraction in *Schmerber.* "The

interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained." *Schmerber* v. *California,* 384 U. S., at 769–770. Similarly, a seizure of voice exemplars does not involve the "severe, though brief, intrusion upon cherished personal security," effected by the "patdown" in *Terry*—"surely . . . an annoying, frightening, and perhaps humiliating experience." *Terry* v. *Ohio,* 392 U. S., at 24–25. Rather, this is like the fingerprinting in *Davis,* where, though the initial dragnet detentions were constitutionally impermissible, we noted that the fingerprinting itself "involves none of the probing into an individual's private life and thoughts that marks an interrogation or search." *Davis* v. *Mississippi,* 394 U. S., at 727; cf. *Thom* v. *New York Stock Exchange,* 306 F. Supp. 1002, 1009.

Since neither the summons to appear before the grand jury nor its directive to make a voice recording infringed upon any interest protected by the Fourth Amendment, there was no justification for requiring the grand jury to satisfy even the minimal requirement of "reasonableness" imposed by the Court of Appeals.[13] See *United States* v. *Doe (Schwartz), supra,* at 899–900. A grand jury has broad investigative powers to determine whether a crime has been committed and who has committed it. The jurors may act on tips, rumors, evidence offered by the prosecutor, or their own personal knowledge. *Branzburg* v. *Hayes,* 408 U. S., at 701. No grand jury witness is "entitled to set limits to the investigation that the grand jury may conduct." *Blair* v. *United States,* 250 U. S., at 282. And a sufficient basis

---

[13] In *Hale* v. *Henkel,* 201 U. S., at 77, the Court found that such a standard had not been met, but as noted *supra,* at 11–12, that was a case where the Fourth Amendment had been infringed by an overly broad subpoena to produce books and papers.

for an indictment may only emerge at the end of the investigation when all the evidence has been received.

> "It is impossible to conceive that . . . the examination of witnesses must be stopped until a basis is laid by an indictment formally preferred, when the very object of the examination is to ascertain who shall be indicted." *Hale* v. *Henkel,* 201 U. S., at 65.

Since Dionisio raised no valid Fourth Amendment claim, there is no more reason to require a preliminary showing of reasonableness here than there would be in the case of any witness who, despite the lack of any constitutional or statutory privilege, declined to answer a question or comply with a grand jury request. Neither the Constitution nor our prior cases justify any such interference with grand jury proceedings.[14]

The Fifth Amendment guarantees that no civilian may be brought to trial for an infamous crime "unless on a presentment or indictment of a Grand Jury." This constitutional guarantee presupposes an investigative body "acting independently of either prosecuting attorney or judge," *Stirone* v. *United States,* 361 U. S. 212, 218, whose mission is to clear the innocent, no less than

---

[14] MR. JUSTICE MARSHALL, in dissent, *post,* p. 31, suggests that a preliminary showing of "reasonableness" is required where the grand jury subpoenas a witness to appear and produce handwriting or voice exemplars, but not when it subpoenas him to appear and testify. Such a distinction finds no support in the Constitution. His dissent argues that there is a potential Fourth Amendment violation in the case of a subpoenaed grand jury witness because of the asserted intrusiveness of the initial subpoena to appear—the possible stigma from a grand jury appearance and the inconvenience of the official restraint. But the initial directive to appear is as intrusive if the witness is called simply to testify as it is if he is summoned to produce physical evidence.

to bring to trial those who may be guilty.[15]   Any holding that would saddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws. Cf. *United States* v. *Ryan,* 402 U. S. 530, 532–533; *Costello* v. *United States,* 350 U. S. 359, 363–364; *Cobbledick* v. *United States,* 309 U. S. 323, 327–328.[16] The grand jury may not always serve its historic role as a protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor, but if it is even to approach the proper performance of its constitutional mission, it must be free to pursue its investigations unhindered by external influence or supervision

---

[15] "[T]he institution was adopted in this country, and is continued from considerations similar to those which give to it its chief value in England, and is designed as a means, not only of bringing to trial persons accused of public offences upon just grounds, but also as a means of protecting the citizen against unfounded accusation, whether it comes from government, or be prompted by partisan passion or private enmity.  No person shall be required, according to the fundamental law of the country, except in the cases mentioned, to answer for any of the higher crimes unless this body, consisting of not less than sixteen nor more than twenty-three good and lawful men, selected from the body of the district, shall declare, upon careful deliberation, under the solemnity of an oath, that there is good reason for his accusation and trial." *Ex parte Bain,* 121 U. S. 1, 11 (quoting grand jury charge of Mr. Justice Field). See also *Wood* v. *Georgia,* 370 U. S. 375, 390.

[16] The possibilities for delay caused by requiring initial showings of "reasonableness" are illustrated by the Court of Appeals' subsequent decision in *In re September 1971 Grand Jury,* 454 F. 2d 580, rev'd *sub nom. United States* v. *Mara, post,* p. 19, where the Court held that the Government was required to show in an adversary hearing that its request for exemplars was reasonable, and "reasonableness" included proof that the exemplars could not be obtained from other sources.

18

so long as it does not trench upon the legitimate rights of any witness called before it.

Since the Court of Appeals found an unreasonable search and seizure where none existed, and imposed a preliminary showing of reasonableness where none was required, its judgment is reversed and this case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

[For separate opinion of MR. JUSTICE BRENNAN, see *post,* p. 22.]

[For dissenting opinion of MR. JUSTICE DOUGLAS, see *post,* p. 23.]

[For dissenting opinion of MR. JUSTICE MARSHALL, see *post,* p. 31.]