**In re GRAND JURY 79–01.**

United States District Court,
N. D. Georgia,
Atlanta Division.

May 7, 1980.

Charles M. Kidd and Woodrow W. Vaughan, Jr., C. David Vaughan, Charles H. Kirbo, Hugh Peterson, Jr. & Larry D. Thompson, Tyrus R. Atkinson, Jr., Atlanta, Ga., Joseph V. Giffin (no address available), for petitioner.

Charles C. Murphy, Jr., James M. Griffin, John R. Fitzpatrick, Antitrust Div., U. S. Dept. Justice, Atlanta, Ga., for respondent.

HORACE T. WARD, District Judge.

The above matter is pending before this court on the motions of defendants to stay proceedings of Grand Jury 79–01 and to supplement the initial charge to this grand jury. Defendants' request for an immediate hearing was granted and after hearing

argument from the attorneys for the parties and receiving written briefs, the court took the matter under advisement.

The movants are individuals and corporations who have been informed by attorneys of the Antitrust Division of the United States Department of Justice that they are targets in a grand jury investigation of alleged Sherman Act violations in connection with the waste disposal business in metropolitan Atlanta. These defendants have joined in this unique and novel motion requesting the court to supplement the initial charge to Grand Jury 79–01.[1]

The movants recognize that the prosecutors would be presenting a statement to the grand jury on the applicable law, but argue that it might be one-sided and that circumstances require an independent charge by the court.

The defendants contend that a clear statement to the grand jury as to what constitutes a criminal antitrust violation is demanded because of the vague and ambiguous nature of the Sherman Act when compared with other criminal statutes and the serious business consequences of a publicized indictment, regardless of the ultimate outcome. This motion is vigorously opposed by the government on the ground that to grant it would seriously imperil the traditional ex parte role of the grand jury procedure and would impose an unnecessary burden on the criminal justice process by adding one more adversary proceeding.

The facts presented at the hearing indicate that the government will recommend to the grand jury that indictments be returned charging the movants with violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. This recommendation appears to be imminent. To date the jurors have only heard a standard charge explaining the nature and function of the grand jury, its weighty responsibilities, its procedures, and its limitations. No specific charge on the elements of an antitrust violation has been read to them. The Assistant United States Attorney informed the court at the hearing on this motion that, contrary to the movants' assertions, it was not his division's standard procedure to merely read the Sherman Act to the panel. Rather, it is the practice (and one which will be followed in this matter) to present the law as it applies to the facts uncovered by the grand jury's investigation.[2]

The court is aware of no federal cases which have required a supplemental charge to a grand jury on the elements of a particular crime prior to the presentation of an indictment. While a number of opinions have found prosecutors' instructions on the applicable law insufficient and misleading, see United States v. Braniff Airways, Inc., 428 F.Supp. 579 (W.D.Tex.1975), the issue has been invariably presented in the form of a postindictment motion to quash or to dismiss. This does not mean that a court is barred from acting sooner. It is clear that

1. Grand Jury 79–01 was impaneled on February 13, 1979 and was charged by Judge William C. O'Kelley as to its duties and responsibilities.

2. The following statements of the prosecutor from transcript of the hearing should be noted:
MR. ORR: . . . It is the prosecutor's duty and it so states in our Division Manual, that we are to be administrators of justice. If we are to do our job properly we are to be sure that the grand jury is given instructions that will hold up in court. If not, we are all wasting our time. It is important to us to make sure all the law is explained and the grand jury is not wrong. . . .
THE COURT: What is the normal procedure? . . .
MR. ORR: The normal procedure is to present the evidence to the grand jury and when the investigation is completed the prose-

cutor will summarize that evidence in an orderly fashion so that the grand jury can have their recollection refreshed; they are told that they do not accept the description of the prosecutor, it is only for their assistance, but their recollection controls. They are also told what the basic law is, it is not a lengthy procedure, but they are told what the statute is and contrary to what the targets say here, we do strongly disagree with the law as described by the targets in the attachment to their motion. . . .

MR. ORR: . . . I did not tell the court we merely read the statute to the grand jury. We read the statute and explain the law as it applied to the facts before the grand jury. We will tell them what customer allocation is and price fixing is.

the supervisory power which district courts exercise over the grand juries they impanel is a broad one which can take many forms. *See, e. g., United States v. Chanen,* 549 F.2d 1306, 1309, 1313 (9th Cir. 1977); *United States v. Estepa,* 471 F.2d 1132, 1135–37 (2d Cir. 1972); *In re Grand Jury Subpoena to Central States, Southeast and Southwest Areas Pension Fund, August Term, 1963,* 225 F.Supp. 923, 925 (N.D.Ill.1964) ("The grand jury contrary to what seems to be the prevailing general belief is an integral part of the judicial arm of the government and is not a mere tool of the prosecutor. . . . The grand jury, being part and parcel of the judicial branch of government, is subject to a supervisory power in the courts, aimed at preventing abuses of its process or authority."); *United States v. Johns-Manville Corp.,* 213 F.Supp. 65, 72 (E.D.Pa.1962) ("Federal courts have inherent power over their process to prevent abuse, oppression and injustice and the process of the court comprehends proceedings before the grand jury . . . ."); *C. Wright, Federal Practice and Procedure* § 101 nn. 9–10. This supervisory power is of course limited in view of the need for grand jury independence, for "[w]hile the grand jury is, in a sense, a part of our court system, when exercising its traditional functions it possesses an independence which is unique." *In re April 1956 Term Grand Jury,* 239 F.2d 263, 269 (7th Cir. 1956). This supervisory power includes the dismissal of indictments on the ground that the grand jurors were not fairly presented with the applicable law. *United States v. Braniff Airways, supra,* 428 F.Supp. at 586. See also *United States v. Gold,* 470 F.Supp. 1336 (N.D.Ill.1979).

■ Nevertheless, courts should refrain from exercising their supervisory prerogative at the preindictment, investigatory stage unless serious abuses have been shown. *United States v. United States District Court,* 238 F.2d 713, 722 (4th Cir. 1956), *cert. denied,* 352 U.S. 981 (1957); *United States v. Johns-Manville Corp., supra,* 213 F.Supp. at 72; *Application of Iaconi,* 120 F.Supp. 589, 591 (D.Mass.1954). Preindictment attacks will almost always be specula-

tive. *In re Grand Jury for November, 1974 Term,* 415 F.Supp. 242, 244 (W.D.N.Y.1976); *United States v. Cowan,* 382 F.Supp. 159, 160 (C.D.Cal.1974). If prosecutorial abuse is shown or a substantial likelihood of its occurrence is demonstrated, a court is well within its supervisory authority in determining that a grand jury is properly instructed on the applicable criminal law. This is merely another facet of the court's duty to preserve the traditional independence of this body, and should be done upon a proper showing that a statute is indistinct.

■ The government's contention that the addition of another adversary proceeding would unduly burden the criminal justice process is certainly worthy of consideration, but is not totally persuasive in the premises here presented. Any increased burden on the criminal justice process must be assessed in relation to other considerations relating to fairness and justice.

The movants' argument rests on a claimed uniqueness in the Sherman Act in that unlike most other criminal statutes it does not clearly set forth the elements of the behavior it penalizes. In making this distinction they rely on a recent United States Supreme Court case, *United States v. United States Gypsum,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). The Chief Justice's opinion described how the Sherman Act differs from most criminal provisions:

The Sherman Act, unlike most traditional criminal statutes, does not, in clear and categorical terms, precisely identify the conduct which it proscribes. Both civil remedies and criminal sanctions are authorized with regard to the same generalized definitions of the conduct proscribed—restraints of trade or commerce and illegal monopolization—without reference to or mention of intent or state of mind. Nor has judicial elaboration of the Act always yielded the clear and definitive rules of conduct which the statute omits . . . Simply put, the Act has not been interpreted as if it were primari-

848

ly a criminal statute; it has been construed to have a "generality and adaptability comparable to that found desirable in constitutional provisions."

438 U.S. at 438–39, 98 S.Ct. at 2874. A report quoted in the opinion made the following recommendation:

> The Sherman Act, inevitably perhaps, is couched in language broad and general. Modern business patterns moreover are so complex that market effects of proposed conduct are only imprecisely predictable. Thus, it may be difficult for today's businessman to tell in advance whether projected actions will run afoul of the Sherman Act's criminal strictures. With this hazard in mind, we believe that criminal process should be used only where the law is clear and the facts reveal a flagrant offense and plain intent unreasonably to restrain trade.

Report of the Attorney General's National Committee to Study the Antitrust Laws 349 (1955). In the *United States Gypsum* case, the court observed that the "gray area" of uncertain prohibition created by the lack of preciseness of the Sherman Act standards did not include prohibitions on conduct which is *per se* illegal. That kind of conduct is clearly subject to criminal sanctions, and includes vertical and horizontal price fixing arrangements, *United States v. General Motors Corp.*, 384 U.S. 127, 147, 86 S.Ct. 1321, 1331, 16 L.Ed.2d 415 (1966), and customer allocation agreements, *United States v. Consolidated Laundries Corp.*, 291 F.2d 563, 574–75 (2d Cir. 1961). The movants and the government agree that these are the type of violations involved in the instant investigation.

█ It is strongly urged by the moving parties that an instruction elucidating the elements of an antitrust offense will not threaten, but strengthen the traditional role of the grand jury. This role has to a great extent been the protection of our citizens from false prosecutions as well as the indictment of lawbreakers. Over a period of centuries, the grand jury grew to be a sturdy bulwark between the Crown and the citizenry, and was highly esteemed for this function at the time of the Continental Congress. *See United States v. Olmstead*, 7 F.2d 756, 758 (W.D.Wash.1925). When presented by Madison in the first draft of the Bill of Rights the provision was unopposed; it was not even debated. *Constitution of the United States of America* 1089 (Cong.Research Serv., Library of Congress 1973). When the English grand jury was transplanted here, it brought its protective function with it, a function which has often been lauded. *See, e. g., United States v. Dionisio*, 410 U.S. 1, 17–18, 93 S.Ct. 764, 773–774, 35 L.Ed.2d 67 (1973); *Hurtado v. California*, 110 U.S. 516, 544, 4 S.Ct. 111, 292, 295, 28 L.Ed. 232 (1884) (Harlan, J., dissenting).

> Historically, this body has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will.

*Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962). The courts have authority to intervene during the preindictment stage to ensure that this insulating purpose is not imperiled by prosecutorial misconduct which may mislead grand jurors. Apparently such intervention could even go so far as to include the giving of a supplemental charge when manifestly necessitated by the situation before the judge.

█ In the present case, any crimes which may be charged will be *per se* violations of the Sherman Act. These are not vague and indistinct, and there is thus little danger that the broad wording of the Sherman Act will necessarily mislead the grand jurors in this case. Moreover, there has been no intimation of prosecutorial misconduct in this matter or any showing that such is likely to occur. Thus, there is no more danger of an unwarranted prosecution here than where investigations of other

criminal violations, based on other statutes, are before the grand jury. The court finds no occasion to use the unprecedented procedure suggested by the movants. Accordingly, the motion of the defendants for supplemental charges on the law to Grand Jury 79–01 is DENIED.

The movants have also requested that the court stay all grand jury proceedings until their motion for a supplemental charge has been ruled on, but in view of the above denial of the motion the motion for stay will be DENIED as moot.

SO ORDERED.