STATE OF OREGON,
*Respondent,*

*v.*

IRVING STEWART WISE,
*Appellant.*

(10-80-01332, CA 18011)

635 P2d 1374

Robert A. Miller, Springfield, argued the cause for appellant. With him on the brief was Wiswall, Svoboda, Thorp & Dennett, P.C., Springfield.

Richard David Wasserman, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, John R. McCulloch, Jr., Solicitor General, and William F. Gary, Deputy Solicitor General, Salem.

Before Buttler, Presiding Judge, and Warden and Warren, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Defendant appeals his convictions for burglary in the first degree and rape in the first degree, contending that the trial court erred in denying his pretrial motions to suppress physical evidence, including photographs of defendant, and out-of-court identifications of defendant, all of which are claimed to be the fruit of an unlawful stop, and to exclude the same photographic throw-down identification and out-of-court line-up identification as being unduly suggestive. We affirm.

On January 25, 1980, at 1:20 a.m., police officers Kerns and Wisdom observed a pickup truck pull into the parking lot of a closed cedar shake mill and its headlights go off. The officers approached the pickup and questioned the driver, Carter, who told them that he had just dropped off defendant at an intersection to visit a friend and that Carter was waiting for him to return. Carter did not know who defendant was going to visit, where he had gone or when he would return.

The officers left Carter and, after turning a corner, saw defendant walking down the street. They stopped and got out of their patrol car. As they began talking with defendant, Carter drove up in the pickup and got out. The officers asked the two men what they were doing and took down their names, addresses, physical descriptions and places of employment. After running a check, they determined that neither of the men was wanted by the police. In addition, an operator's license check was run, as a result of which they learned that Carter did not have an operator's license. When questioned, defendant informed the officers that his driver's license had been suspended. After telling Carter and defendant not to drive the vehicle, the officers left the scene and the two men walked away.

Shortly thereafter, while they sat in their parked patrol car discussing their encounter with Carter and defendant, Kerns mentioned to Wisdom that defendant appeared to fit the physical description of a rape suspect the officers had been given in briefing the day before. The rape had occurred during the early morning hours of January 24, 1980. The officers then observed the pickup go behind them and turn onto another street. Having learned

that neither man was licensed to drive, they pursued the truck and stopped it. Carter was driving; defendant was in the passenger's seat. The officers asked for the registration, but neither man could produce it. Carter told police that the vehicle was owned by a friend whom he could not identify.

A stolen automobile records check proved negative, but it gave the police the name of the registered owner of the pickup. The police did not try to contact the registered owner. Officer Kerns advised the two men that he believed that the vehicle might be stolen and stated that he would like to take their pictures so that if it was determined later that the vehicle was stolen, defendant and Carter would be tied to the pickup. The two officers and Carter testified that both men were amused and that each of them consented to having his photograph taken. Defendant testified he thought he had no choice in the matter, but agreed that neither he nor Carter objected.

While one police officer was writing out a citation to Carter, the other called for a third officer, who arrived and took the pictures. Defendant testified that from the time the officers stopped Carter until the third officer arrived to take the pictures, five to ten minutes elapsed. Carter was then given a citation, after which he and defendant left the scene on foot.

On returning to the police station, the officers turned over the pictures to Detective Friedemann, who was investigating the rape. Because the photographs taken of Carter and defendant were in color, Detective Friedemann made black and white copies so that they would be consistent with other photographs to be used in a photographic throw-down. On January 30, 1980, the victim picked defendant's picture from the six photographs shown her, although she said she could not be certain he was the rapist. On the basis of that identification, Detective Friedemann obtained search and arrest warrants and on February 4, 1980, arrested defendant. The search of defendant's home resulted in the seizure of several articles of defendant's clothing.

On February 8, 1980, the victim picked defendant out of a line-up. Defendant was the only person included in

both the photographic throw-down and the in-person line-up, but the victim was not told that the suspect was present in the line-up.

On appeal, defendant raises four assignments of error, the first three of which invoke variations of the "fruit of the poisonous tree" rationale of *Wong Sun v. United States,* 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963); the fourth assignment of error contends that both out-of-court identifications of defendant were unduly suggestive. Discussion of the assigned errors will be divided into those two categories.

## FRUIT OF THE POISONOUS TREE

In this court, defendant starts with the proposition that his initial stop by the police officers was not based upon any reasonable suspicion that he had committed a crime, ORS 131.615,[1] and therefore all evidence derived from that illegal stop must be suppressed. The argument continues in a mushrooming fashion: because the officers learned, as a result of the first stop of defendant, that neither he nor Carter was licensed to operate a motor vehicle and because that information formed the basis for the subsequent stop of Carter while driving the automobile, which in turn led to the photographing of defendant, his identification in a throw-down, leading to the issuance of a warrant to search his home, to the seizure of physical evidence and to defendant's subsequent identification in a lineup, all of that evidence must be suppressed.

In the trial court, however, defendant conceded that it was not necessary to decide whether his first encounter with the officers constituted an illegal stop. *See State v. Warner,* 284 Or 147, 161, 585 P2d 681 (1978). Rather, he argued that the second stop was the "critical"

---

[1] ORS 131.615 provides:

"(1) A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that he is a peace officer, make a reasonable inquiry.

"(2) The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time.

"(3) The inquiry shall be considered reasonable only if limited to the immediate circumstances that aroused the officer's suspicion."

one.[2] Having taken that position in the trial court, the validity of the first stop was either waived, or if there was error, it was invited. *State v. Anderson,* 15 Or App 607, 517 P2d 339, *rev den* (1974). We will not consider that question for the first time on appeal.

■ As a result of the first encounter between the officers and defendant and Carter, the officers learned that neither of them was licensed to operate an automobile. Accordingly, when the officers observed the pickup being operated by Carter, they had probable cause to stop Carter, which they did. Defendant contends, however, that even if the police had probable cause to stop Carter, they did not have any basis for stopping him. Of course, defendant was in the vehicle, and when Carter stopped it, defendant was stopped "as an incident to his being a passenger in a vehicle lawfully stopped." *State v. Zimmerlee,* 45 Or App 107, 112, 607 P2d 782, *rev den* 289 Or 71 (1980). If nothing further had developed, the officers could not have used the traffic stop as an excuse to begin questioning or investigating matters unrelated to the traffic reason for the stop; the officers could have lawfully done no more than write out a citation and send Carter and defendant on their way. *State v. Carter/Dawson,* 287 Or 479, 600 P2d 873 (1979).

Something further did develop when neither Carter nor defendant could produce the motor vehicle registration and could not name the owner of the vehicle. At that point, the officers had a basis for reasonably suspecting that the pickup was stolen and, on that basis, they had a right to detain both defendant and Carter for a reasonable time in order to check out the registration and to attempt to determine whether the vehicle was stolen. It is not clear from the record how long the investigation into those

---

[2]

"I don't think it is essential for the Court to determine whether or not that [the first encounter] actually constitutes a stop. There are different levels of police conduct ranging from an arrest, which no one is contending occurred on either of these occasions, to simply walking up to an individual and asking them questions without any interference with their liberty. I don't think the Court needs to decide whether or not this contact on 35th Street crossed the threshhold [*sic*] into being a Terry type stop or a statutory stop. I don't think that we have to get to that. If it did, I don't think there were sufficient circumstances to support it, but I don't think we have to reach that issue.

"The critical stop is the second stop, the one on 42nd Street * * *."

matters took; defendant stated that between five and ten minutes elapsed from the time Carter was stopped until the photographer arrived. It is reasonable to infer from the record that the officers could have issued the traffic citation to Carter at about the same time they asked him and defendant if they would mind having their pictures taken to "tie them to the truck" in the event it later developed that the truck was stolen. Up to that point, the length of the detention appears reasonable. If one of the officers involved in the stop had taken the pictures at that time, we see no reason why he could not have done so without infringing on defendant's Fourth Amendment rights, *see United States v. Dionisio,* 410 US 1, 93 S Ct 764, 35 L Ed 2d 67 (1973),[3] with or without defendant's consent, and without violating ORS 131.615(3). *See* n 1, *supra.* The question is whether extending the detention time to await the arrival of the photographer exceeded the bounds of reasonableness.

Here, both of the officers and Carter testified that, when asked, Carter agreed to remain at the scene to have his picture taken. The most that can be said for defendant's position is that he said he did not expressly consent to being photographed and did not object because he did not think he was free to leave. He does not, however, contend that he was in custody.

At least one of the officers testified that defendant was free to leave, and defendant did not testify that he would have left had he felt free to do so. Even though defendant said he felt he had no choice but to have his photograph taken, all of the others present testified that he agreed to it. Whether he did or not,[4] it is clear from the

---

[3] In *United States v. Dionisio,* 410 US 1, 93 S Ct 764, 35 L Ed 2d 67 (1973), the court, in discussing the permissibility of compelling voice examplars, said:

> "* * * The physical characteristics of a person's voice, its tone and manner, as opposed to the content of a specific conversation, are constantly exposed to the public. Like a man's facial characteristics, or handwriting, his voice is repeatedly produced for others to hear. No person can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world. * * *" 410 US at 14.

[4] The trial court made no findings of fact. Accordingly, we assume that the court found the facts necessary to support its legal conclusion, so long as the evidence and all reasonable inferences which may be drawn therefrom support such facts. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968).

record that the officers had no reason to believe that defendant objected to remaining at the scene or to being photographed. For all that appears, he was waiting for his friend, Carter, and remained at the scene for that reason and was willing to be photographed at the same time Carter was photographed. Given those facts, we do not think it is unreasonable to require that a person in defendant's position make known any objection he might have to remaining at the scene. Therefore, there was sufficient evidence for the trial court to find that defendant's failure to object was tantamount to consent to be photographed.

■    Accordingly, we conclude that the photograph of defendant was not obtained unlawfully and, therefore, was not the fruit of a poisonous tree; there was no poisonous tree. The photograph could be used, as it was, in a photographic throw-down and the identification of defendant at that time used to support a search warrant which, in turn, authorized the search of defendant's home and seizure of certain physical evidence. Defendant having been identified from the photograph, his arrest and inclusion in a lineup was justified.

## UNDULY SUGGESTIVE IDENTIFICATION

■    Defendant contends that both the photographic throw-down and the in-person line-up identifications were impermissibly suggestive. His basis for contending that the photographic throw-down was unduly suggestive is that the photograph of defendant was of a quality different from the others used in the throw-down. An examination of the photographs does not support that argument. The only thing which might make defendant's photograph distinct from the others is that the background is darker; however, the backgrounds in all of them differ from one another. We conclude that there was nothing unduly suggestive in the photographic throw-down.

■    With respect to the line-up identification, defendant contends that it was unduly suggestive because defendant was the only person who appeared in both the photographic throw-down and the in-person line-up. Assuming that there may be cases where such a circumstance might be considered suggestive, we do not believe that it was suggestive here. The victim was not told that the suspect

whom she had previously identified by photograph would be in the line-up. Further, individual pictures of those in the line-up, as well as the line-up as a group, are in evidence; from our examination of those pictures we believe the line-up was fairly presented to the victim. In fact, one person was taken out of the line-up because he did not closely enough match the description of the rapist given the police by the victim.

The victim explained in detail her opportunity to observe her assailant for more than an hour. She had no trouble identifying him in the line-up. Accordingly, we conclude that neither out-of-court identification of defendant was impermissibly suggestive and that there was no substantial likelihood of misidentification.

The trial court did not err in denying defendant's motions to suppress.

Affirmed.