# IN RE: A SPECIAL INVESTIGATION NO. 237

[No. 533, September Term, 1982.]

*Decided April 7, 1983.*

The cause was argued before MOYLAN, LOWE and ADKINS, JJ.

*Deborah K. Handel, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Stefan D. Cassella, Assistant Attorney General,* on the brief, for appellant.

*Albert H. Turkus,* with whom were *Dow, Lohnes & Albertson* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

It is highly unlikely that the Medicaid Fraud Control Unit of the Attorney General's Office or the Baltimore City Grand Jury working with that Unit was ever concerned with a self-contained and parochial larceny that occurred in Prince George's County; yet the argument of the appellee Hospital

would have it so. Why should the appellee do this? Obviously, because it suits its purpose to do so, and it suited its purpose very well when a judge of the Criminal Court of Baltimore bought that argument. As a result, the judge issued an order on March 14, 1982, refusing to compel compliance on the part of the appellee Hospital with a subpoena *duces tecum* issued by that grand jury.

This is a companion case to *In Re: A Special Investigation No. 224,* 54 Md.App. 137, 458 A.2d 454, filed by us today. The holding of that case and the legal reasoning behind the holding control completely our decision here and, accordingly, we will vacate the order in this case. In one small way, however, this decision is not totally relegated to the shadow of that one but serves to supplement it. That decision set forth *what* the law is. This case provides a vivid illustration of *why* the law properly is what it is.

Beginning in August, 1981, a Baltimore-based grand jury, working with the Medicaid Fraud Control Unit, conducted an investigation of large-scale fraud on the part of a closely related hospital and nursing home, (collectively, the Hospital) in Prince George's County, and of its owners, administrators, and employees.

In the course of that investigation, it learned that two air compressors in the boiler room of the Hospital had apparently been stolen from the Suitland Record Center, also located in Prince George's County and run by the General Services Administration of the United States Government. A search warrant was issued in Prince George's County and was executed on January 20, 1982. In the course of that search, the agents of the State took photographs of the air compressors, paint scrapings, serial numbers, and other identifying data. On February 19, the Baltimore City Grand Jury issued a subpoena *duces tecum* to the Custodian of Records of the Hospital, seeking "all records for the years 1979 through and including 1981 pertaining to the purchase, maintenance, insurance or other costs associated in any way with the two Honeywell 7.5 horsepower air compressors bearing identification numbers

MD41182V and MD41183V which are located in the boiler room of [the particularly described Hospital, including its location]."

When the Custodian of Records failed to respond to this subpoena *duces tecum,* the State filed on April 23 a Motion to Compel Compliance with Grand Jury Subpoena *Duces Tecum.* The Hospital opposed the motion. A hearing for purposes of argument, but involving the production of no evidence, was conducted before a judge of the Criminal Court of Baltimore on May 13. On May 14, that judge filed an order, refusing to grant the State's motion to compel compliance. This appeal has followed from that order.

We agree with the appellee, as we did in the companion case, that what is involved is not a matter of venue, which involves simply the question of where the trial shall take place, *State v. Jones,* 51 Md.App. 321, 443 A.2d 967 (1982), but rather a matter of territorial jurisdiction, which goes to the very validity of the charging document. *McBurney v. State,* 280 Md. 21, 371 A.2d 129 (1977).

We hold, however, as we held in that case, that an issue involving territorial jurisdiction is not ripe for consideration until there has been an indictment, until we know what crime, if any, has been charged and until there is a defendant with requisite standing to raise the challenge. We hold further, as we held further in that case, that a mere witness, even if the witness might possibly at some future time become a defendant, is utterly incompetent to challenge the authority of the grand jury to act.

> "In truth it is in the ordinary case no concern of one summoned as a witness whether the offense is within the jurisdiction of the court or not." *Blair v. United States,* 250 U.S. 273, 282, 39 S.Ct. 468, 63 L.Ed. 979 (1919).

Pertinent here, as pertinent there, is the observation from *United States v. Dionisio,* 410 U.S. 1, 16-17, 93 S.Ct. 764, 35 L.Ed.2d 67, 80 (1973):

"[A] sufficient basis for an indictment may only emerge at the end of the investigation when all the evidence has been received."

This case, moreover, demonstrates the wisdom of that law. How does one judge the product until the product is complete? If a Baltimore-based grand jury were ultimately to return an indictment charging theft in Prince George's County, with no conspiratorial overtones echoing from Baltimore City, with no peripheral aiding or abetting having occurred in Baltimore City, with no instrumentalities flowing from nor proceeds flowing to Baltimore City, an attack upon the territorial jurisdiction of the charging grand jury might well be appropriate if brought at a proper time by a defendant with proper standing.

If, however, the activity in Prince George's County was but an overt act in a conspiracy, a part of which occurred in Baltimore City; if funds fraudulently obtained from the State Health Department based in Baltimore City had gone into the purchase of stolen goods in Prince George's County; if the Baltimore-based Health Department had been charged fraudulently for the purchase of equipment that had been stolen or charged excessively for the purchase of stolen goods bought at a bargain, the lack of territorial jurisdiction might not be so clear. One cannot anticipate what the charges may be, while the investigation is still in progress.

Yet, just such anticipation was indulged in. The Attorney General tried nobly to convey the message that the Medicaid Fraud Control Unit was not usurping the function of the Crimes Against Property Squad. At the hearing on May 13, he argued forcefully:

"The allegations that are involved concern the possibility that the maintenance people and the owners of the hospital together committed certain acts which might constitute medical assistance fraud. That is, certain monies in the Maintenance Department may have been used improperly in such a way as to constitute a medicaid fraud case,

and so our investigation with respect to medicaid fraud has centered on the Maintenance Department. The subpoena to the hospital for the records that pertain to the compressors, therefore, relate not only to the possibility that those records would be evidence of the theft crime from the federal office building, but those same records would potentially relate to the medicaid fraud investigation because for all the Grand Jury and the Attorney General knows, the taking of those compressors from the federal office building to the hospital was part of the same scheme that constitutes the medicaid fraud case and that is why I contend that we have the right, the Grand Jury has the right, to subpoena the records of the hospital that would pertain to those compressors. Wholly apart from the merits of any theft case that those records are essential to the medical assistance fraud case that we have been investigating."

The last words spoken, before the judge concluded that hearing, were:

"But maybe, Your Honor, the person who received the stolen goods used medicaid money to pay for them. That is exactly why we want the records here in the Baltimore City Grand Jury."

The effort to look beyond the foreground of simple theft was in vain. This was attributable in part to the performance of the appellee's attorney, who was able to shift roles with an agility that was dazzling. At times, he displayed the Byzantine cunning of a Medici, as he distinguished away authorities cited by the State that seemed absolutely controlling; at other times, he assumed the studied incomprehension of the village simpleton, as he manifested a shocked disbelief that the possession and utilization of stolen equipment, by one arguably billing the State for maintenance expenses, could have conceivable pertinence to anything other than simple theft. At one moment, he would

probe the subterranean depths; at the next moment, he stood child-like on the surface of events, with disingenuous innocence even to the possibility that surface happenings might have subsurface ramifications. In the last analysis, it worked.

Yet, long experience still teaches that in criminal investigation, as in scientific investigation, sound empirical methods dictate that all available data be gathered and studied before theories are framed. False leads as well as true leads must be run down. Exculpatory as well as inculpatory proof may be revealed. The study of countless apparently innocent or ambiguous events may reveal patterns that take on significance only in macrocosm. The sound investigator, like the sound scientist, does not start with a conclusion and work backward. A legitimate inquiry proceeds without certain knowledge as to what the ultimate conclusions will be. *United States v. Dionisio,* 410 U.S. 1, 13, 93 S.Ct. 764, 35 L.Ed.2d 67, 78-79 (1973), spoke to the virtue of thorough and exhaustive fact-gathering:

> " '[A] grand jury's investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed. . . .' "

Legitimate bank accounts may reveal that money has been "laundered." Lawful purchases may reveal a net income, which cannot be explained. Expense accounts may produce reimbursement for monies that were never spent. Unoffending telephone calls may reveal the location of persons or the relationship between persons, which have significance in other contexts. Innocent activities may reveal patterns of contact and relationships that have significance in proving more sinister activities. The possession of stolen compressors may be a valuable clue in proving dozens of things, some anticipated and some yet unanticipated, beyond the fact of larceny. The grand jury here never got the opportunity to gather its clues, to study its material, and to frame its conclusions. We cannot know what they would have produced and we cannot judge the validity of the unknown.

The order in this case leaped to a conclusion as to what the grand jury would probably do and then sat in judgment over that speculative end product. It did the thing that *Hale v. Henkel,* 201 U.S. 43, 65, 26 S.Ct. 370, 50 L.Ed. 652 (1906), said should not be done:

> "It is impossible to conceive that ... the examination of witnesses must be stopped until a basis is laid by an indictment formally preferred, when the very object of the examination is to ascertain who shall be indicted."

The proof of subtle white-collar fraud is, generally, largely circumstantial and involves the painstaking accumulation of a mass of circumstances. A long-term investigation of such white-collar fraud does not proceed with the linear directness of an investigation into a street robbery or a fist in a face in a barroom, and it is not expected to. The rush to judgment here was premature, was precipitous, and was wrong, in logic and in common experience as well as in law.

*Order vacated;\* costs to be paid by appellee.*

---

\*Neither at the hearing below nor before us has counsel for either party raised any issue with respect to mootness. There are too many possibilities for us to take judicial notice of anything in this regard, even if we were so inclined.