■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WILLIAM ALLEN, Appellant.

The central issue in the case was the complainant's identification of the defendant as her assailant. The defendant contends that the trial court erred in refusing to permit him to display a physical characteristic to the jury unless he took the stand and submitted to cross-examination by the prosecutor.

The evidence established that the complainant was raped and sodomized on the evening of January 5, 1983, in her apartment building in The Bronx. The complainant, who returned home at about 10:00 P.M., noticed a man wearing a blue hood and brown overjacket standing in the lobby as she entered. She summoned the elevator and rang for the ninth floor where she lived, but the elevator stopped on the second floor. When the doors opened she saw the man in the blue hood standing with a gun pointed at her face. He told her to get off the elevator and she complied. He then said "everybody is going to pay, everybody is going to suffer." The complainant, who is 4 feet, 11 inches tall, looked up at the man's face as he spoke, wondering what he was referring to.

The man forced the complainant, at gunpoint, to walk down to the first floor landing where he repeatedly raped and sodomized her. During the attack, the complainant heard someone descending the stairs. Her attacker threatened that if she screamed he would kill her and whoever was coming downstairs. No one, however, descended to the first-floor landing. Before fleeing, the man took the complainant's watch and ordered her to remove her pants. After she had done so, he ran out the front door and the complainant ran upstairs to her apartment.

Later that evening, the complainant described her attacker to police officers as a tall black male, wearing a blue hood, brown overjacket, blue jeans, and white sneakers. When asked to specify her assailant's height, she pointed to her uncle who was 6 feet tall. A short while later, the police officers brought a dark-skinned hispanic suspect back to the complainant. However, she recognized him as a man from the neighborhood and stated he was not her attacker. The next day, in an interview with a detective from the Bronx Sex Crimes Unit, the complainant again gave essentially the same description of her attacker, but she added that the man had a chipped tooth.

On January 9, the complainant went to the photo unit at the 48th Precinct where, after reviewing approximately 600 photographs, she selected a picture of the defendant. When asked how certain she was of this identification on the scale of 1 to 10 the complainant answered "nine and a half." On January 14, she again selected a photograph of the defendant and said that this time she was 100% certain of her identification. Following the defendant's arrest, the complainant viewed a lineup of six individuals and selected him as the man who had raped her.

The complainant testified that she observed her assailant's face in the lobby, where the lighting was good, and on the second floor, where it was even brighter. She clearly saw his face about seven times in all during the attack and she had noted that one of his upper right incisors had "a little crack on the bottom part of the tooth, just a little chip. You could hardly notice it though." She identified the defendant as her assailant.

The defense called a tavern owner who testified that the defendant, who frequently helped him by doing odd jobs, was at the tavern from 7:00 until after 11:00 on the evening in question rehearsing for a show. Defense counsel then moved to have the defendant exhibit his teeth to the jury and offered to introduce the defendant's dental records from when he was admitted to the Marine Corps in 1980. The defense also planned to call an expert witness to testify that the defendant's mouth had not undergone alteration from that time to the time of trial.

The trial court, apparently under the impression that the evidence proffered by the defendant was testimonial in nature, ruled that if the defendant exhibited his teeth to the jurors, he would be subject to cross-examination by the People as to the condition of his mouth on January 5, 1983, and as to anything that would relate to his credibility. This was error.

The condition of the defendant's tooth on the date of the rape was a critical piece of evidence bearing on the identification of the defendant as the rapist, inasmuch as the chipped tooth was an unusual, distinguishing feature observed by the complainant. The Marine Corps dental records made prior to the incident together with expert testimony that the defendant's upper right tooth had not been altered since those records were made, sufficed to establish the relevance of the real evidence which the defendant proposed to show to the jury *(People v Shields,* 81 AD2d 870 [2d Dept 1981]; *see also,*

*People v Rodriguez,* 64 NY2d 738, 741 [1984]). The display of the accused's physical characteristics has long been held not to implicate the Fifth Amendment privilege against self-incrimination because such evidence is nontestimonial in nature *(Holt v United States,* 218 US 245, 252-253 [1910]; *United States v Dionisio,* 410 US 1, 5-6 [1972]). Thus, the trial court would have unnecessarily required the defendant to take the stand and undergo cross-examination in order to present to the jury the best evidence, which was nontestimonial, in support of his defense of mistaken identity *(People v Shields, supra,* at 871). Given that the only proof of the defendant's guilt was the complainant's identification, this error cannot be deemed harmless. *(See in general,* Stadtmauer, *Exhibit A: the Human Body,* 60 NY St B J 38.)

We have considered the other claims raised by the defendant and find them without merit. We therefore reverse and remand for a new trial. Concur—Kupferman, J. P., Sandler, Carro, Rosenberger and Smith, JJ.