UNITED STATES of America, Plaintiff-Appellee,

v.

William Luther SECHRIST, a juvenile, Defendant-Appellant.

No. 80–2001.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 10, 1980.

Decided Feb. 6, 1981.

---

Dennis P. Coffey, Milwaukee, Wis., for defendant-appellant.

Elizabeth L. Adelman, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before SWYGERT and CUMMINGS, Circuit Judges, and BROWN, Senior District Judge.*

SWYGERT, Circuit Judge.

Defendant William Luther Sechrist, a Menominee Indian youth, appeals from an adjudication of delinquency. He contends that this adjudication was barred by the speedy trial provisions of the Federal Juvenile Delinquency Act, as amended,[1] and that certain fingerprint evidence was illegally obtained and should have been suppressed. We affirm the district court's rulings on both grounds.

I

The trial was conducted pursuant to stipulated facts. On November 1, 1979, employees of the Menominee Tribal Court on the Menominee Indian Reservation in northeastern Wisconsin discovered that a break-in had occurred the previous evening in the Tribal Court clerk's office. Approximately $1,969.00 had been taken from the cash box there and from other locations.

---

* The Honorable Wesley E. Brown, United States Senior District Judge for the District of Kansas, sitting by designation.

1. 18 U.S.C. §§.5031–5042 (1976).

On December 6, 1979, in the course of its investigation aiding the Menominee Tribal Police, the FBI interviewed the defendant, who had been working at the courthouse in late October 1979. Sechrist denied any involvement in the burglary and any knowledge of where the clerk kept money. He also told the FBI agent that his fingerprints would not be found on items from inside a file cabinet that had been pried open and vandalized. Pursuant to an *ex parte* order entered by a federal magistrate, the agent took Sechrist's fingerprints. A fingerprint specialist compared these prints with those found on items lying on the floor in the clerk's office the morning following the break-in and determined that eight latent prints were those of the defendant. Meanwhile, Sechrist bragged to three acquaintances that he had broken into the Tribal Courthouse and stolen $2,000.

On April 17, 1980, an information charging Sechrist with burglary and theft was filed in the Eastern District of Wisconsin, and a warrant was issued for his arrest. In addition, the Government filed a certification that no state jurisdiction existed, pursuant to the terms of the Federal Juvenile Delinquency Act, as amended.[2] On that day Sechrist was a resident at Lincoln Hills School, a facility operated by the State of Wisconsin for delinquent children, where he had been committed as a consequence of an adjudication of delinquency by the Menominee Tribal Court on an unrelated matter. The United States Marshal forwarded a detainer to the school on the following day. Sechrist was advised of the detainer on April 22; he signed it and simultaneously filed a request for a speedy trial. The United States Attorney's Office received the signed detainer and the speedy trial demand on April 29. The Government procured two days later a writ of habeas cor-

pus ad prosequendum that directed Sechrist to appear before the magistrate on May 7. Deputy marshals took custody of the defendant on May 5. Motions to dismiss the information and to suppress the fingerprint impressions were filed at the initial hearing before the district court on May 7. The court denied these motions on May 30. Trial was held pursuant to the stipulated facts on June 3, and the court found Sechrist delinquent with respect to both counts of the information the following day. Sechrist was committed to the custody of the Attorney General for two years; he has been serving his time at the Lincoln Hills School.

## II

We first address Sechrist's contention that his detention violated the speedy trial provision of the Federal Juvenile Delinquency Act, as amended. That section provides, in relevant part:

> If an alleged delinquent who is in detention pending trial is not brought to trial within thirty days from the date upon which such detention was begun, the information shall be dismissed on motion of the alleged delinquent or at the direction of the court.

18 U.S.C. § 5036 (1976). Sechrist argues that, for purposes of this section, his "detention" began either on the date the certification of jurisdiction was filed and the arrest warrant issued (April 17), or the date on which the detainer was lodged with the Lincoln Hills School (April 18), or on which he signed it (April 22). Whichever date was chosen, his trial on June 3 would have been more than thirty days later and, under the terms of the statute, the information should have been dismissed. Defendant relies on a Ninth Circuit case, *United States v. Andy,*

---

**2.** The Act provides:

A juvenile alleged to have committed an act of juvenile delinquency shall not be proceeded against in any court of the United States unless the Attorney General, after investigation, certifies to an appropriate district court of the United States that the juvenile court or other appropriate court of a State (1) does not have jurisdiction or refuses

to assume jurisdiction over said juvenile with respect to such alleged act of juvenile delinquency, or (2) does not have available programs and services adequate for the needs of juveniles.

If the Attorney General does not so certify, such juvenile shall be surrendered to the appropriate legal authorities of such State.

18 U.S.C. § 5032 (1976).

549 F.2d 1281 (9th Cir. 1977).[3] We disagree with the logic behind that case, and we find the facts to be distinguishable. We hold that his detention began on the date on which he was actually taken into federal custody by deputy marshals (May 5), which was only twenty-eight days before his trial.

In *United States v. Andy, supra* at 1283, the Ninth Circuit held that the thirty-day period in section 5036 runs from

(1) the date the Attorney General certifies, or in the exercise of reasonable diligence, could have certified, to the conditions stated in Section 5032, or (2) the date upon which the Government formally assumes jurisdiction over the juvenile, whichever event earlier occurs.

The court found such a holding necessary in order to "harmonize" sections 5032 and 5036. We cannot see, however, any conflict between the two sections that needed to be resolved. The certification procedure in the Federal Juvenile Delinquency Act encompasses a recognition of the general policy of federal abstention. The official summary and analysis of the 1974 amendments to the Act stated:

The federal courts and federal correctional system have never been properly equipped to handle large numbers of juveniles with the result that federal juvenile delinquents are frequently transferred away from their home communities for treatment. By deferring jurisdiction to state courts, the harmful effects of this dislocation would be reduced.

120 Cong.Rec. 25162 (1974). The certification procedure was designed to ensure that only where jurisdiction existed nowhere but in the federal courts or where the particular state did not have available programs and services adequate for the needs of juveniles were the federal courts to intrude in a juvenile case. Sechrist has not cited, nor can we find, any statements in the legislative history which indicate that the certification procedure was in any way related to the speedy trial provisions of the Act. The dissenting judge in *Andy* so recognized: "An action triggering device which authorizes the Federal District Court to proceed, certification does not answer the question of how detention for purposes of Section 5036 shall be measured." 549 F.2d at 1283. We agree that there is no connection between the certification procedure and the speedy trial requirement of the Act.

We also believe the facts of this case to be significantly different from those in *Andy*. At the time the information was filed in this case, Sechrist was a resident at the Lincoln Hills School, where he was serving time on an unrelated charge. This fact alone suffices to distinguish this case from the *Andy* decision, in which the juvenile was originally held in state custody for seventeen days before being transferred to federal custody on the same charge. In that case, the juvenile would not have been in jail except for the arrest on the charge for which he was ultimately convicted. Sechrist, however, would have been in custody for the entire period regardless of the federal charges because of his earlier adjudication of delinquency by the Menominee Tribal Court on the unrelated charge. The federal authorities did not exercise any control over Sechrist until the deputy marshals took him into custody on May 5.

We therefore hold that the thirty-day period in section 5036 does not begin to run until that date on which the juvenile is taken into physical custody for the charged offense.[4] This holding is in accord with the ordinary meaning of the word "detention" and the use of the word in other sections of

---

3. Sechrist also cites in support of his contentions, *United States v. Gonzales-Gonzales*, 522 F.2d 1040 (9th Cir. 1975). We find this case inapposite, since it decided an issue of waiver and not the commencement of the thirty-day period in section 5036.

4. We note that under our standard as well, the authorities in *Andy* would have violated the speedy trial requirements. The juvenile in that case was taken into custody by state officials on January 2, 1976, and transferred to federal custody on January 19. Since he was eventually tried on the same charges for which he was originally incarcerated on January 2, the thirty-day period began on that date. His trial did not occur until February 19—eighteen days beyond the expiration of the permissible time.

the Act,[5] which imply that physical custody is an essential element.[6]

The issuance of the arrest warrant could not trigger the speedy trial limits, for that action merely authorizes a federal marshal to arrest the juvenile. It does not place him in "detention" but only provides a legal process for doing so. Similarly, the lodging of a detainer ought not commence the thirty-day period. "A detainer is merely a notice that the prisoner is wanted to face pending criminal charges and requires further process ... before the prisoner is turned over." *United States v. Scallion*, 548 F.2d 1168, 1173 (5th Cir.), *cert. denied*, 436 U.S. 943, 98 S.Ct. 2843, 56 L.Ed.2d 784 (1977). *See also United States v. Kenaan*, 557 F.2d 912, 915–16 (1st Cir.), *Cert. denied*, 436 U.S. 943, 98 S.Ct. 2844, 56 L.Ed.2d 784 (1977). The lodging of a detainer does not confer any control over the juvenile to federal authorities. The Interstate Agreement on Detainers gives the prisoner the option to assert his speedy trial rights under such circumstances, as Sechrist did in this case. Two days after the Government received his request to proceed expeditiously, the Government moved the court to issue a writ of habeas corpus ad prosequendum. Sechrist thus suffered no detriment because of the detainer that could be sufficient to constitute "detention" under the meaning of the Act.[7]

If the issuance of an arrest warrant or the section 5032 certification—or even the simple ability to make the certification, as the Ninth Circuit held in *Andy*—triggered the running of the thirty-day period, a juvenile who was at large and who could not be located through no fault of his own might never even be arrested before the thirty-day period expired. He could then seek dismissal of the charges for violation of the

speedy trial limit, although he had never spent a day in custody or possibly had never even known about the pendency of the charges. Congress clearly did not intend any such result.

## III

Sechrist also contends that the district court improperly rejected his motion to suppress his fingerprint exemplars which were taken pursuant to an *ex parte* order issued by a federal magistrate, in accordance with 18 U.S.C. § 5038(d)(1) (1976). He argues that there was no probable cause to issue that order and that it therefore violated his Fourth Amendment rights. The Government concedes that there was not sufficient evidence before the magistrate to constitute probable cause. Recent Supreme Court opinions have made clear, however, that no probable cause was necessary to take the fingerprint impressions in this case, when the juvenile was already in lawful custody. We therefore hold that no Fourth Amendment violation occurred.

The analysis of any Fourth Amendment claim involves a potential violation at two different levels: "the 'seizure' of the 'person' necessary to bring him into contact with government agents ... and the subsequent search for and seizure of the evidence." *United States v. Dionisio*, 410 U.S. 1, 8, 93 S.Ct. 764, 768, 35 L.Ed.2d 67 (1973). When the FBI agent took Sechrist's fingerprints in December 1979, Sechrist was incarcerated in the Shawano County Jail, as he was awaiting trial before the Menominee Tribal Court on an unrelated matter. Because he was in lawful custody at the time, there could be no Fourth Amendment violation with respect to the first level of analysis: the "seizure" of the person.[8]

---

5. *See, e. g.*, sections 5034 and 5035.

6. *See United States v. Cuomo*, 525 F.2d 1285, 1292 (5th Cir. 1976) ("the phrase 'in detention' in section 5036 means 'in physically restrictive detention amounting to institutionalization' ").

7. In *United States v. Cuomo, supra*, the court similarly held that restrictive bail conditions

did not amount to "detention" for the purposes of section 5036.

8. *United States v. Rogers*, 475 F.2d 821 (7th Cir. 1973); *United States v. Sanders*, 477 F.2d 112, 113 (5th Cir. 1973) (taking palm print while "legally under arrest ... removes the first level of a potential Fourth Amendment infringement.").

We therefore turn to consider whether the actual taking of the fingerprint exemplars without probable cause infringed Sechrist's Fourth Amendment rights. The Fourth Amendment tests a search or seizure under a standard of reasonableness, in which the need to search or seize is balanced against the invasion into one's privacy that the search or seizure entails.[9] Although the Government in this case could not establish probable cause, it did have grounds to suspect that Sechrist was the thief. Latent fingerprints had been found on several items left thrown in the clerk's office, and the clerk suspected Sechrist because the youth had recently learned the location of the cash box. In fact, Sechrist was working in the clerk's office to make restitution for a previous theft.

■ The degree of invasion of one's privacy is measured by a person's "reasonable expectation of privacy" and the process of the search or seizure.[10] "What the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960). The taking of a person's fingerprints simply does not entail a significant invasion of one's privacy. The Supreme Court noted in *Davis v. Mississippi*, 394 U.S. 721, 727, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969), that "fingerprinting involves none of the probing into an individual's private life and thoughts that marks an interrogation or search."[11] The procedure involves only passive participation by the individual and very little inconvenience, particularly in this case where Sechrist was already in legal custody. Fingerprinting is such an unobtrusive process that it is even used in many noncriminal contexts.[12] The Supreme Court in *Davis* found the fingerprinting process to involve such a minimal intrusion into one's privacy that it was arguable that "the requirements of the Fourth Amendment could be met by narrowly circumscribed procedures for obtaining, during the course of a criminal investigation, the fingerprints of individuals for whom there is no probable cause to arrest." 394 U.S. at 728, 89 S.Ct. at 1398. In *United States v. Dionisio, supra,* the Court confirmed that this statement was not mere dictum when it was cited in holding that the taking of voice exemplars *without probable cause* did not infringe upon any interest protected by the Fourth Amendment. The Court held "there was no justification for requiring . . . even the minimal requirement of 'reasonableness' imposed by the Court of Appeals." 410 U.S. at 15, 93 S.Ct. at 772. The minimal burden imposed on Sechrist in requiring him to submit to fingerprinting did not therefore infringe his Fourth Amendment rights.[13]

■ Sechrist argues that section 5038(d)(1) of the Federal Juvenile Delinquency Act, as amended, which requires that the photograph or fingerprints of a juvenile be taken only with the written consent of a judge,[14] invests greater rights in a juvenile than in an adult and that a juvenile like Sechrist therefore is entitled to a *Miranda*-type warning that he may contest the order. He is correct that the statute grants a juvenile greater protection, for it requires that a judge (or magistrate)

9. *Camara v. Municipal Court,* 387 U.S. 523, 536–37, 87 S.Ct. 1727, 1734–35, 18 L.Ed.2d 930 (1967); *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968).

10. *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring); *Terry v. Ohio, supra,* 392 U.S. at 9, 88 S.Ct. at 1873; *United States v. Dionisio,* 410 U.S. 1, 8, 93 S.Ct. 764, 768, 35 L.Ed.2d 67 (1973).

11. In that case, the Court held that the particular procedures involved—including an illegal detention—rendered the fingerprints unconstitutional. Because Sechrist was already in legal custody, no such problems arise in this case.

12. *See Thom v. New York Stock Exchange,* 306 F.Supp. 1002, 1008–09 (S.D.N.Y.1969).

13. *See also Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (taking of blood sample during lawful arrest reasonable in light of circumstances), and *Terry v. Ohio, supra* ("patdown" of clothing for weapons did not violate Fourth Amendment).

14. 18 U.S.C. § 5038(d)(1) (1976).

consider the order, while an adult could be required to give his fingerprints without any such consideration by a neutral third party. The statute nowhere mandates—nor does its legislative history anywhere indicate—that the judge or magistrate is bound by a probable cause standard. The Congressional purpose was to protect the privacy of a juvenile by granting discretion in an impartial official who could weigh the interests of the juvenile against the interests of the investigating authorities and their reasonable belief that there were grounds for taking the fingerprints. Adults have no such protection. By enacting section 5038(d)(1) in the midst of a section requiring the confidentiality of juvenile records, Congress created a mechanism to ensure that a juvenile's fingerprints or photograph would not be taken unnecessarily and that once taken, they would remain secret.[15] Although a juvenile could under some circumstances contest an order requiring fingerprinting, the statute neither implicitly nor explicitly requires that the juvenile be told in advance he might have that right.[16] The procedure followed in this case gave Sechrist the protections to which he was entitled under the Act.[17]

### IV

The trial court properly denied Sechrist's motions to dismiss the information and to suppress the fingerprint evidence. We affirm the adjudication of delinquency.

AFFIRMED.

---

**15.** 93d Cong., 2d Sess., S.Rep.No. 93–1011, as reprinted in 1974 U.S.Code Cong. & Admin. News 5283, 5312.

**16.** We note, for example, that when a search warrant is executed—pursuant to an *ex parte* order similar to that required by section 5038(d)(1)—the party whose property is to be searched has no right to a *Miranda*-type warning that he could contest it.

**17.** Sechrist also argues that the Government could have protected his rights by taking him before a grand jury to consider whether his fingerprints should be taken. We find it unnecessary to decide whether a juvenile may be called before a grand jury, since we have held that no probable cause was necessary to compel his fingerprints and that the statute, which makes no mention of grand juries, grants him all the protections to which he was entitled.