[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**
**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**11/30/99**
**THOMAS  K. KAHN**
**CLERK**

No. 97-2618

D.C. Docket No. 95-89-CR-T-24-C

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SIGMA INTERNATIONAL, INC.,
d.b.a. SIGMA U.S.A., INC; CHARLES
STERNISHA, et al.,

Defendant-Appellant.

Appeal from the United States District Court
for the Middle District of Florida

**(November 30, 1999)**

Before TJOFLAT and BIRCH, Circuit Judges, and BRIGHT*, Senior Circuit
Judge.

---

*Honorable Myron H. Bright, Senior U.S. Circuit Judge for the Eighth Circuit,
sitting by designation.

TJOFLAT, Circuit Judge:

Sigma International, Inc., William Andrew Walton, and Charles Sternisha (referred to collectively as "Sigma")[1] were convicted of crimes arising out of a scheme to fraudulently import, adulterate, and distribute in interstate commerce frozen shrimp from India and China. They appeal, challenging the validity of their indictment and various rulings the district court made over the course of their trial. Walton and Sternisha also challenge the district court's application of the sentencing guidelines in fashioning their sentences. We affirm, but remand for reduction of the sentences imposed on Walton and Sternisha.

I.

The United States Food and Drug Administration (the "FDA") maintains an Import Alerts list, which identifies the international products, processors, and packers that have a history of noncompliance with the FDA's standards. The products of companies on this list are automatically detained by the FDA and the

---

[1] Sigma International, Inc. is a seafood company with a processing plant in St. Petersburg, Florida. At the time of the events giving rise to the indictment in this case, William Andrew Walton was the vice-president and manager of Sigma's international division, also located in St. Petersburg. Sternisha was the manager of the St. Petersburg plant. Sigma, Walton, and Sternisha raise the same points on appeal; therefore, we refer to them jointly as Sigma. But, when discussing them individually, we refer to them by their individual names.

United States Customs Service ("Customs") upon entering the United States. The FDA also maintains an "A" list, which identifies packers and processors with a history of complying with FDA's standards. Products of companies on the "A" list are only detained if random sampling suggests noncompliance with FDA standards. In late 1991, the FDA issued an Import Alert for Indian shrimp. Thus, all Indian shrimp, except that of packers on the "A" list, was automatically detained upon entering the United States.

Prior to the arrival of a shipment in the United States, the receiving company presents the FDA and Customs with invoices and other documents indicating where the shipment will be coming from, what the shipment will contain, and the identity of the packer. The FDA and Customs use these invoices to determine whether to detain a particular shipment. If an invoice indicates that the packer is on the FDA's "A" list, the shipment is not usually detained. Conversely, if the invoice identifies a packer not on the "A" list and the product is from a country on the Import Alerts list, the product is automatically detained.

In the beginning of 1992, Sigma bought 701 cartons of frozen Indian shrimp and had them packed by Bliss Impex. Bliss Impex was not on FDA's "A" list. Thus, the 701 cartons would automatically be detained when they reached Florida.

To avoid this automatic detention, Sigma had its customshouse broker[2] return to Sigma the Bliss Impex invoices and other documents Sigma had prepared for submission to Customs and the FDA. Sigma then altered these documents to indicate that Silver Star Sea Foods,[3] an "A" list packer, had packed the shrimp. In February 1992, Sigma bought three additional shipments of frozen Indian shrimp and had Bliss Impex pack them.[4] On each occasion, Sigma altered the documentation to indicate that Silver Star Sea Foods packed the shrimp.

Later in 1992, Sigma substituted the name Coral Sea Foods, another "A" list packer, for Silver Star Sea Foods on its import documents. Sigma used Coral Sea Foods as the bogus packer for at least two shipments, one for 525 cartons of shrimp and another one for 393 cartons, that Bliss Impex had actually packed. After the shipments left India, Sigma learned that the FDA had removed Coral Sea Foods from the "A" list. Sigma thus changed the packer name on the documentation for the these two shipments from Coral Sea Foods to Silver Star

---

[2] Customshouse brokers are specialists hired by importers to help get products through the Customs and the FDA entry processes.

[3] Silver Star Sea Foods did not give Sigma permission to use its name. During the FDA's investigation of this case, Sigma asked the principals of Silver Star Sea Foods and Bliss Impex to tell the FDA that Silver Star Sea Foods had packaged the shrimp Sigma imported from India. The owners refused Sigma's request.

[4] The first shipment was for 100 cartons, the second for 267 cartons, and the third for 450 cartons.

Sea Foods. Because the cartons left India before Sigma altered the import documents, the labels on the cartons still identified Coral Sea Foods as the packer. So, when the shrimp reached Sigma's plant in St. Petersburg, Sigma had its employees remove the Coral Sea Foods labels and replace them with generic labels that read "packaged for Sigma International."

While an FDA inspector was conducting random sampling of the 525 carton shipment at Sigma's plant, he found a few Coral Sea Foods labels still on the boxes and became suspicious about the validity of the shipment's documentation. The FDA began an investigation of Sigma's practices relating to the importation of Indian shrimp. During its investigation, the FDA searched Sigma's offices and the St. Petersburg plant and observed large quantities of shrimp, which had been imported from China, soaking in a chlorine wash. Naturally, this discovery heightened the FDA's concern about Sigma's handling of imported shrimp, and the agency broadened its investigation.

In late 1994 and early 1995, several Sigma customers began to complain that the frozen shrimp Sigma was sending them was decomposing. Because the shrimp had come from China, Sigma decided to test everything their customers returned. Sigma sorted the rejected shrimp into a 5000 series, representing shrimp that was acceptable in its current condition, and a 6000 series, representing shrimp that

appeared to be unacceptable but might be salvageable if washed.  To determine whether the 6000 series shrimp could be saved, Sigma partially thawed the shrimp and tested it organoleptically for decomposition, by smelling and feeling the shrimp.  Then, Sigma "washed" the 6000 series shrimp by soaking it in Sea Fresh, a mixture of copper sulfate, chlorine, and lemon juice.  If, after the "washing," the shrimp passed a new organoleptical test, Sigma renumbered the shrimp in a 7000 series, refroze it, and resold it to other customers.   If, after the "washing," the shrimp still smelled too bad to sell, Sigma renumbered the shrimp in a 8000 series and stored it in its plant.

In the fall of 1994, Sigma's method of importing frozen shrimp from India and its processing of frozen shrimp from China became the subject of a grand jury investigation in the Middle District of Florida.  The Assistant United States Attorney (the "AUSA") assigned to the case was Michael Rubinstein.  He presented the case to the grand jury and, after an indictment was returned, was lead counsel for the Government throughout the proceedings in the district court.

Three separate grand juries considered this case.  The first grand jury indicted Yaw-Bin Huang, Sigma's president, in April 1995.  The indictment, which was sealed, charged him with the same offenses alleged in the superseding indictment now before us.  Huang fled the United States before the indictment was

6

returned and has not been apprehended. With the indictment against Huang lying dormant, Rubinstein presented the case to a second grand jury, which had been convened on September 6, 1994. The targets of the investigation were, in addition to Huang, the appellants and Jagadeesh Reddy, Robert Fields, and Geogy Kannikal (who were tried with appellants and acquitted). This grand jury received evidence throughout its twelve-month term of service, but took no action. According to a statement Rubinstein made to the third grand jury, the second grand jury did not vote on whether to indict.

The third grand jury was convened on September 13, 1995. The grand jury's first order of business was to consider the case against Sigma and its officials. Rubinstein began presenting the case on the 13th, and on the afternoon of the next day, the grand jury returned the instant superseding indictment (the "indictment").

The superseding indictment contained twelve counts. Counts one through four involved the Indian shrimp; counts five through twelve involved the Chinese shrimp. Count one charged the defendants with conspiring to defraud the FDA and Customs and conspiring to introduce adulterated shrimp into interstate commerce in violation of 18 U.S.C. § 371 (1994). Counts two and three charged the defendants with two different instances of knowingly and willfully introducing

7

imported goods by means of false statements in violation of 18 U.S.C. § 542 (1994).  Count four charged the defendants with obstructing justice in violation of 18 U.S.C. § 1505 (1994) by attempting to obtain false testimony from, among others, the principals of Silver Star Sea Foods and Coral Sea Foods.  Counts five through eight charged the defendants with four separate instances of adulterating Chinese shrimp in violation of 18 U.S.C. § 331(k) (1994).  Counts nine through twelve charged the defendants with four separate instances of introducing adulterated Chinese shrimp into interstate commerce in violation of 21 U.S.C. §§ 331(k), 333(a)(2), and 342(a)(3), (b)(3) (1994).

The case went to trial before a jury on August 6, 1996.  During the Government's case, as required by the Jencks Act, 18 U.S.C. § 3500 (1994), Rubinstein gave the defendants a copy of an FDA agent's grand jury testimony.  In reviewing the testimony, defense counsel concluded that Rubinstein had testified at length and had made several inappropriate and prejudicial comments before the grand jury.  The defendants, therefore, moved the court to review, and unseal, the transcript of the grand jury proceedings.  Anticipating that the transcript would reveal pervasive prosecutorial misconduct, the defendants also moved the court to dismiss the indictment.

The district court denied the defendants' motions. At the same time, the court informed the defendants of the dates on which the three grand juries were empaneled. From this information, they were able to determine that the third grand jury had returned its indictment after considering the case for less than two days. Based on this disclosure, the defendants renewed their motion to dismiss the indictment. The district court stayed consideration of the renewed motion until the return of the jury's verdict.

On October 18, 1996, the jury returned a verdict of guilty against Sigma and Andrew Walton on all twelve counts of the indictment. Charles Sternisha was found guilty of nine counts, those involving the adulteration and introduction into interstate commerce of Chinese shrimp. After the jury returned its verdicts, the district court denied Sigma's motion to dismiss the indictment, stating that the petit jury's guilty verdicts had rendered harmless any error that may have occurred before the grand jury. Following the imposition of sentence, Sigma, Walton, and Sternisha appealed.

As noted in the introduction to this opinion, appellants challenge the validity of the indictment, various trial court rulings, and the court's application of the Sentencing Guidelines. We address the first and third challenges in parts II and III

below.  The second challenge, to various trial court rulings set out in the margin,[5] is without merit and requires no further comment.

## II.

## A.

The Fifth Amendment to the Constitution guarantees that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."  U.S. Const. amend. V.  History suggests that the primary reason for this requirement was to provide a "protective bulwark standing solidly between the ordinary citizen and the overzealous prosecutor."  United States v. Dionisio, 410 U.S. 1, 17, 93 S. Ct. 764, 773, 35 L. Ed. 2d 67 (1973).  Because grand juries were useful in protecting colonists from British prosecution during the Revolution, the Framers included grand juries in the Bill of Rights hoping they would work equally well to check overreaching by their

---

[5] Appellants contend that the following errors require vacating their convictions and a new trial:  (1) the district court abused its discretion in permitting Rubinstein, over defense objection, to ask prosecution witnesses an excessive number of leading questions; (2) Rubinstein commented on Sternisha's post-Miranda silence; (3) the court abused its discretion by admitting into evidence reports made by FDA agents; (4) the court erred when it refused to instruct the jury, as Sigma requested, concerning chlorine's status in the relevant FDA regulations; and (5) the court abused its discretion in refusing to admit into evidence one of defendant's summary exhibits.

own government.  <u>See</u> 1 Sara Sun Beale & William C.  Bryson, <u>Grand Jury L. & Prac.</u> § 1:03 (1986).

Although the Framers included a grand jury requirement in the Bill of Rights, they did not assign the grand jury to a specific branch of government.  This construction makes the grand jury an independent, pre-constitutional body that relies on the power of the judiciary when it needs assistance in accomplishing its constitutionally-assigned task of returning indictments.  <u>See</u> <u>Brown v. United States</u>, 359 U.S. 41, 49, 79 S. Ct 539, 546, 3 L. Ed. 2d 609 (1959), <u>overruled on other grounds</u>, <u>Harris v. United States</u>, 382 U.S. 162, 168, 86 S. Ct. 352, 356, 15 L. Ed. 2d 240 (1965); <u>John Roe, Inc. v. United States (In re Grand Jury Proceedings)</u>, 142 F.3d 1416, 1424-25 (11th Cir. 1998) (explaining that although a grand jury relies on the judiciary when it seeks subpoenas or contempt sanctions, it "performs its investigative and deliberative functions independently").  When a court invokes its supervisory power to check grand jury abuses, therefore, it is really supervising the prosecutor, who, as an officer of the court, presents cases for the grand jury to consider.  <u>See</u> <u>United States v. Serubo</u>, 604 F.2d 807, 816 (3d Cir. 1979) (stating that "this court and others have increasingly exercised our supervisory power over the administration of justice to regulate the manner in which grand jury investigations are conducted").  A court may also review a grand jury investigation

to ensure that an independent and informed grand jury returned the indictment. Cf. Dionisio, 410 U.S. at 16-17, 93 S. Ct. at 773 ("This constitutional guarantee presupposes an investigative body 'acting independently of either prosecuting attorney or judge.' ") (quoting Stirone v. United States, 361 U.S. 212, 218, 80 S. Ct. 270, 273, 4 L. Ed. 2d 252 (1960)). A court will not, however, dismiss an indictment merely because the grand jury based its decision to indict on evidence that would be inadmissable at trial. To do so would infringe on the grand jury's independence. See Costello v. United States, 350 U.S. 359, 363, 76 S. Ct. 406, 408-09, 100 L. Ed. 397 (1956); United States v. Brown, 872 F.2d 385, 388 (11th Cir. 1989).

A court may dismiss an indictment based on the violation of a defendant's Fifth Amendment grand jury right,[6] only if the defendant can show that he or she was prejudiced by the violation. See Bank of Nova Scotia v. United States, 487 U.S. 250, 254, 108 S. Ct. 2369, 2373, 101 L. Ed. 2d 228 (1988) ("[A] court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants."). Conduct that compromises the structural protections

_____

[6] Some constitutional rights are not protected in the grand jury context. See, e.g., United States v. Calandra, 414 U.S. 338, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974) (upholding a grand jury subpoena based on evidence obtained in violation of the Fourth Amendment). See generally United States v. Williams, 504 U.S. 36, 49, 112 S. Ct. 1735, 1743, 118 L. Ed. 2d 352 (1992) (citing examples of constitutional protections usually afforded criminal defendants that have no application in the grand jury setting).

of the grand jury, so as to render its proceedings fundamentally unfair, is the only exception to this prejudice rule. See id. at 256-57, 108 S. Ct. at 2374. After Bank of Nova Scotia, courts further narrowed the fundamentally unfair exception so that it only encompasses violations involving racial discrimination in the grand jury pool, as this was the only example the Supreme Court gave of a violation that compromised the structural protections of the grand jury process. See id. at 257, 108 S. Ct. at 2374-75. All other claims of grand jury violation require that a defendant establish prejudice before an indictment will be dismissed. See, e.g., United States v. Williams, 504 U.S. 36, 64, 112 S. Ct. 1735, 1751, 118 L. Ed. 2d 352 (1992); United States v. Exarhos, 135 F.3d 723, 726-27 (11th Cir. 1998), cert. denied, __ U.S. __, 119 S. Ct. 1275, 143 L. Ed. 2d 369 (1999), (refusing to overturn an indictment even though the government presented forged documents). The standard for dismissing an indictment based on prosecutorial misconduct has thus been articulated as whether the misconduct "substantially influenced the grand jury's decision to indict," or whether we have "grave doubt that the [grand jury's] decision to indict was free from the substantial influence of [the prosecutor's misconduct]." Bank of Nova Scotia, 487 U.S. at 256, 108 S. Ct. at 2374 (internal quotation marks omitted).

13

We review denials of motions to dismiss an indictment for abuse of discretion. See United States v. Pielago, 135 F.3d 703, 707 (11th Cir. 1998). In this case, the district court used an out-dated standard for determining whether to dismiss the indictment.[7] Notwithstanding this error, however, we conclude that the district court did not abuse its discretion in denying appellants' motion to dismiss the indictment.

B.

This circuit has yet to issue a post-Bank of Nova Scotia opinion dismissing an indictment because prosecutorial misconduct substantially influenced the decision to indict. See, e.g., Exarhos, 135 F.3d at 727 (finding that the defendant had not shown bad faith or prosecutorial misconduct); United States v. Jennings, 991 F.2d 725, 729 (11th Cir. 1993) (finding that having the victim's friend on the grand jury did not substantially influence the decision to indict because the prosecution presented overwhelming evidence of probable cause). Although today

---

[7] The district court applied the standard from United States v. Mechanik, which held errors in a grand jury's charging decision harmless if a petit jury subsequently entered a guilty verdict against the defendant. Compare United States v. Mechanik, 475 U.S. 66, 70, 106 S. Ct. 938, 942, 89 L. Ed. 2d 50 (1986), with United States v. Kramer, 864 F.2d 99, 101 (11th Cir. 1988) (stating that conviction by a petit jury would not render a prosecutor's misconduct before a grand jury harmless if that misconduct substantially influenced the decision to indict).

14

we are faced with unacceptable conduct on the part of a prosecutor, we do not find that this conduct overbore the grand jury such that it was unable to make an independent decision to indict. Rubinstein had three agents testify, read portions of prior grand jury testimony, told the grand jury everything that had been presented to the prior grand jury was available to it, allowed the grand jurors to question the agents, and ultimately allowed the grand jurors to decide when they wanted to vote on the indictment. These actions left the final indicting decision up to the grand jury.

We would be remiss in our responsibility to protect the integrity of the grand jury process, however, if we did not discuss Rubinstein's conduct before the third grand jury.[8] The first thing Rubinstein said to the grand jury after introducing himself was "I'm here to present to you this morning some evidence and some legal explanation about a case which we'll be asking you to vote on and consider tomorrow." He then told the jurors that he would screen their questions, answering

---

[8] The fact that this AUSA has been the subject of a previous prosecutorial misconduct case, see United States v. Crutchfield, 26 F.3d 1098 (11th Cir. 1994) (remanding case for new trial because AUSA's intentional misconduct prejudiced defendants), makes it all the more imperative that we address his unacceptable actions before the grand jury. Further, short of dismissing the indictment based on a finding of prejudice, a court may reprimand a prosecutor through a published opinion to deter misconduct before a grand jury. See Bank of Nova Scotia, 487 U.S. at 263, 108 S. Ct. at 2378 (suggesting contempt of court, discipline by the bar, and chastisement as alternative deterrents to dismissal).

15

them himself when possible, to speed up the process.  See Sept. 13th Tr. at 7.  At the beginning of day two, he again told the jurors that he wanted to rush them so they could vote at the end of the day.  See Sept. 14th Tr. at 1.  Such statements were inappropriate.  A prosecutor may not set the grand jury's schedule for it, nor may a prosecutor suggest that the grand jury has a limited amount of time in which to reach a decision.  See ABA Standards for Criminal Justice Prosecution Function 3-3.5(a) (3d ed. 1993) (stating that prosecutors should give due deference to the grand jury as an independent body).  By telling a brand-new grand jury that it would vote tomorrow, Rubinstein nearly foreclosed any serious questioning or deliberation by that body.[9]  Several times, however, he clarified that he did not

_____

[9] Rubinstein also attempted to foreclose deliberation by the third grand jury by suggesting that the only reason the previous grand jury did not indict was that its term of service ended before he could take a "critical" deposition and present it to the grand jury.  He implied that had the previous grand jury not run out of time, it would have indicted appellants.  Specifically, he said,

> The problem that they had was that they wanted to vote on it.  They wanted to be in position to hear the evidence and decide, just as you're being asked to do, since they'd heard it for months.  They'd heard these witnesses and they were interested in it and they were following it very avidly.  And then I came to them and I said, I'm sorry, you're not going to get a chance to vote on this case because of an administrative situation in my office with the travel budget basically.  So until we resolve that, I don't have time.  And they all said, oh, I'm so sorry, good-bye, and now I'm presenting it to a new Grand Jury.

Sept. 13th Tr. at 77.  The record reflects that Rubinstein's statements were simply untrue.  More importantly, it was improper for Rubinstein to say this in an attempt to

want to rush the jurors unfairly; if they needed more time they were to let him know.  In addition, at the end of the second day, he allowed the grand jury to make its own decision (without him in the room) about whether to vote that day.

Although in the end, the grand jury made an independent decision to indict, Rubinstein attempted to turn that independent decision into simply a rubber stamp decision.  For instance, at various points during his presentation, Rubinstein told the grand jury how to interpret the evidence in order to find that the appellants acted knowingly (an element of the crimes charged) on specific occasions that were critical to the Government's case.[10]  A prosecutor's job is to present evidence of criminal activity to a grand jury.  In so doing, the prosecutor may also explain

_____

transform the grand jury's deliberative process into a cursory review.

[10] Some of the most egregious examples of this include:  (1) "[t]he significance of that is that that tells you that on that date, okay, on that date, you know that Andy Walton knows . . . [a]ll future packing will be in Coral. . . . You now know that Andy Walton knows that as of that date," id. at 51; (2) "The paperwork is okay.  It looks good, but he knows that he got in trouble before on the stupid labels.  So he gets back to Kannikal and he says: I know you did the paperwork, but what about the labels on the cartons?  I need to know that right away," id. at 67; (3) "[s]o they're aware – Kannikal is aware in India that Agent Siberski in Tampa is trying to get the shipment details from Makkar," id. at 87; (4) "you asked me what's the significance of that [fax], and I said it was because in Andy Walton's mind he knew something. . . . So Andy Walton knew that there was this relationship. . . . So he knows on the 21st," id. at 102; (5) "Now, another story that [Walton's] giving him that you know that [Walton] knows isn't true is we were under the impression that this product was packed and processed by Silver Star."  Sept. 14th Tr. at 28.

17

why a piece of evidence is legally significant, but he may not tell the jury what inferences it should draw from the evidence. Factual questions are for the grand jury to determine on its own. See ABA Standards for Criminal Justice Prosecution Function 3-3.5(a) & cmt. (3d ed. 1993) (stating that a prosecutor may explain the law and the legal significance of the evidence, but he must leave to the grand jury the determination of whether the evidence constitutes probable cause); cf. United States v. Birdman, 602 F.2d 547, 551-55 (3d Cir. 1979) (explaining the dangers of a lawyer acting as both advocate and witness before a grand jury). Courts have recognized that grand juries, which are drawn from a pool of ordinary citizens, may need some assistance understanding criminal laws; thus, they allow prosecutors to explain the law and interpret the legal significance of evidence. But, courts have consistently emphasized that a prosecutor must temper his assistance in order to preserve the grand jury's independence. See Williams, 504 U.S. at 63, 112 S. Ct. at 1750. A prosecutor who informs the grand jury of both the legal and factual significance of the evidence he has presented risks infringing on the grand jury's independence and jeopardizing the integrity of its proceedings. Most of the inferences Rubinstein drew from the evidence were apparent. Therefore, his comments on what the evidence established, while out of line, were not so far out that they cause us seriously to doubt the grand jury's independence in this case.

18

In addition to the foregoing, Rubinstein inappropriately commented on other crimes he thought the appellants had committed – crimes that were neither under investigation nor relevant to the grand jury's inquiry. For instance, Rubinstein said he was going to send to the FDA lab shrimp that may have been exposed to chlorine Sigma used to clean the trays in which shrimp was repacked – the inference being that the defendants had engaged in more criminal activity than what was being presented to the grand jury. In fact, he suggested that exposing shrimp to chlorine in this way might constitute another, as of yet uncharged crime. See Sept. 14 Tr. at 96-97.[11] Rubinstein also suggested that Sternisha had lied to the second grand jury. Although Sternisha had not been charged with perjury, Rubinstein nonetheless opined that Sternisha had lied to the grand jury and therefore should be indicted. See id. at 198 (stating "it appears that Mr. Sternisha lied to the Grand Jury. . . . So, that's why I think he's a good prospect to get indicted"). Any lawyer with a grain of common sense and even a limited understanding of the code of ethics should know that remarks such as these are

---

[11] In addition to saying that he was going to send the shrimp to the FDA lab, Rubinstein voiced his opinion about whether the chlorine had adulterated the shrimp, one of the elements of the crime charged, saying: "[y]es. I think that in my opinion and the opinion, I think, of most shrimp consumers, that is not what they consider to be shrimp that they want to buy or eat. It's an inferior product." Sept. 14th Tr. at 203-04.

intolerable, for they serve no purpose other than to foster prejudice against the person under investigation. See United States v. Hogan, 712 F.2d 757, 760-61 (2d Cir. 1983) (calling defendant a "real hoodlum" and introducing evidence of irrelevant crimes impaired the independence of the grand jury); Serubo, 604 F.2d at 818 (finding prosecutor's reference to the defendants as Cosa Nostra hatchet men impermissible).

The conduct Rubinstein cited as criminal was irrelevant to whether the appellants had committed the crimes charged in the indictment (which Rubinstein had already drafted). To the grand jury, however, the conduct might have appeared to be relevant; suggesting that the appellants were persons of bad character and as such were likely to have committed those crimes. See ABA Standards for Criminal Justice Prosecution Function 3-3.5(b) (3d ed. 1993) (stating that "[t]he prosecutor should not make statements or arguments in an effort to influence grand jury action in a manner which would be impermissible at trial before a petit jury"); cf. Fed. R. Evid. 404.

In sum, as condemnable as Rubinstein's conduct before the grand jury was, it does not appear that it caused the grand jury to return an indictment that

20

otherwise would not have issued.[12]  For this reason, the appellants' Fifth Amendment right was not violated, and the indictment need not be dismissed.

## III.

## A.

Walton was convicted on all twelve counts of the indictment.  To determine the sentence range for these counts, the district court divided the counts into two groups in accordance with Sentencing Guidelines section 3D1.4.  Group one consisted of counts one through four, which related to the Indian shrimp.  Section 2F1.1 of the Sentencing Guidelines, which applies to cases of fraud, applied to counts one, two, and three.  Section 2J1.2 of the Guidelines, dealing with obstruction of justice, applied to counts one and four.  Because the Government was unable to establish a non-speculative value for the loss attributable to the importation of the Indian shrimp, the parties and the court agreed that Walton should be sentenced on those counts under section 2J1.2, rather than section 2F1.1. Section 2J1.2 yielded an offense level of fifteen.

---

[12] We note that, toward the end of the second day, several jurors argued with Rubinstein, stating that the chlorine had improved, not adulterated, the shrimp.

21

Group two consisted of counts one and five through twelve, relating to the Chinese shrimp. Under section 2F1.1, which applied to these counts, the offense level is determined by adding a number of levels taken from the loss table to a base offense level of six. The district court, over Walton's (and Sternisha's) objection, calculated the loss at $724,000, which translated into a ten-level increase and a final offense level of sixteen. Adding three levels under section 3B1.1(b) for being a manager and two levels under section 2F1.1(b)(2) for more than minimal planning, the offense level for the group two offenses came to twenty-one, six offense levels higher than that for the group one offenses. Due to this differential, section 3D1.1-1.4 required the court to add one level to the highest of the two groups; hence, the offense level for the group two offenses was twenty-two. Since Walton had a criminal history category of one, the sentence range for each count was forty-one to fifty-one months imprisonment. The court sentenced Walton at the bottom of the range, to concurrent prison terms of forty-one months and concurrent supervised release terms of twenty-four months. The court also imposed a $10,000 fine.[13]

---

[13] The judgment in Walton's case does not indicate the count(s) on which the fine was imposed.

22

Sternisha was convicted of counts one and five through twelve. Grouping was unnecessary in his case; section 2F1.1, the fraud guideline, governed the sentence range for each count. The offense level for these counts was eighteen, the same level the court arrived at in Walton's case less three levels for being a manager of the criminal activity. Like Walton, Sternisha's criminal history category was one; this coupled with an offense level of eighteen yielded a sentence range of twenty-seven to thirty-three months. Also as in Walton's case, the court sentenced Sternisha to the bottom of the sentence range, imposing concurrent prison terms of twenty-seven months and concurrent supervised release terms of twenty-four months. The court also imposed a $6,000 fine.[14]

Sigma was convicted on all twelve counts of the indictment. The court sentenced Sigma to concurrent terms of sixty-months probation on each count, and a $1 million fine.[15]

Walton and Sternisha challenge their sentences, questioning the district court's methodology for determining, under section 2F1.1, the amount of the loss attributable to their conduct.

---

[14] As in Walton's case, the judgment does not indicate the count(s) on which the fine was imposed.

[15] The judgment does not indicate the count(s) on which the fine was imposed.

B.

We review the district court's interpretation of the Sentencing Guidelines <u>de novo</u>. <u>See</u> <u>United States v. Toussaint</u>, 84 F.3d 1406, 1407 (11th Cir. 1996). The district court's calculation of loss, however, is a factual determination which we review for clear error. <u>See</u> <u>id.</u>; <u>see also</u> <u>United States v. Cabrera</u>, 172 F.3d 1287, 1292 (11th Cir. 1999). The guidelines do not require that a district court determine loss with precision; but the loss determination will only be upheld if it is a reasonable estimate given the information available. <u>See</u> <u>id.</u> The district court's decision to include the Chinese shrimp segregated and washed after February 23, 1995, within its loss calculation under section 2F1.1 was unreasonable; we therefore reverse its decision to increase appellants' offense level by ten based on this calculation.

It is a fundamental precept of criminal law that people may only be sentenced for the crimes they commit. Conversely, if conduct does not constitute a crime, people may not be punished for that conduct. In this case, the "washing" that occurred after February 23, 1995, was not illegal; it was done without chlorine and under State of Florida supervision. Conduct engaged in with the government's approval is generally not a crime. To sentence the appellants for the post-February

24

washing based on the theory that they would have committed a crime had they not been arrested would be akin to sentencing a bank robber for robbing all the banks in town rather than just the one he actually robbed because, had he not been arrested, he would have continued to rob banks. That is simply ridiculous. We sentence people based on the crimes they commit, not their criminal propensities.[16]

On February 23, 1995, the FDA entered Sigma's St. Petersburg plant, put a "stop sale" order on all of Sigma's 6000 and 7000 series shrimp, and ordered Sigma to cease washing its shrimp in Sea Fresh. Thereafter, any shrimp washing that occurred at Sigma's plant was done under government supervision. Because the washing occurred with the government's approval, it was not a crime, and Walton and Sternisha cannot be punished for participating in it. The district court thus erred when it included the 200,000 pounds of shrimp washed under government supervision after February 23, 1995 within its amount of loss calculation. The court should have calculated the loss using only the 208,306.23 pounds washed before February 23.[17] Further, the court erred in calculating the

---

[16] This case may be distinguished from the sentencing in bank fraud cases, in which the offender is caught after making a fraudulent application for a loan, but before the bank parts with its money. In those cases, the crime is complete when the defendant makes the fraudulent application. Thus, the defendant may be sentenced based on the anticipated outcome of the fraudulent conduct even if no monetary loss has occurred.

[17] Both appellants and the Government agreed that the shrimp weights listed by Sigma's Chinese suppliers were routinely 10% to 25% higher than the actual weight

25

value of the shrimp based on an average of its value before and after that date. Here again, the court should have just used the pre-February 23 figure: $2.01 per pound.

Although the court erred by including the shrimp washed under government supervision within its loss calculation, it did not err in calculating the amount of the loss based on the intended loss rather than the gain to the offender. Appellants argued that loss, under section 2F1.1, should have been calculated based on Sigma's gain, not on its victims' losses. See U.S.S.G. § 2F1.1 appl. n. 8. Thus, appellants presented evidence at sentencing showing that Sigma made $82,178.54 in profit from the sale of the adulterated shrimp and argued that this number should provide the basis for any section 2F1.1(b)(1) increase. If the district court had calculated loss based on Sigma's profit, rather than on what Sigma intended its victims to lose, the court would have been crediting Sigma for the material required to propagate its fraud. It would be nonsensical to reduce Sigma's sentence based on the cost it incurred to adulterate and resell the shrimp.[18]

---

of the shrimp supplied. To account for this overestimate, we subtracted 10% (23,145.14 lbs) from the Chinese weight listed (231,451.37 lbs.) to arrive at a more accurate measure of the amount of shrimp washed before February 23 (208,306.23 lbs.).

[18] Appellants cite several cases for the proposition that the section 2F1.1 loss calculation should be based on the offender's gain. With one exception, United States

In sum, the district court chose the correct method for figuring the amount of the loss under section 2F1.1, but it calculated that loss incorrectly. The amount of the loss for section 2F1.1(b)(1) purposes should have been calculated by multiplying the amount of shrimp washed before February 23 (208,306.23 lbs.) by the value of that shrimp ($2.01). This would have resulted in an intended loss of $418,080, which corresponds to a nine level increase under section 2F1.1(b)(1). Thus, the appellants total offense level under section 2F1.1 should be fifteen.

IV.

In conclusion, we reiterate that Rubinstein's conduct before the grand jury was unacceptable; the sort of conduct that should be sanctioned. We do not direct the district court to dismiss the indictment in this case for one reason: we cannot say that we have grave doubts that the grand jury's decision to indict was the

---

v. Shriver, 967 F.2d 572, 574 (11th Cir. 1992), these cases hold that intended loss is the appropriate method for calculating loss under section 2F1.1. Although the court in Shriver affirmed the district court's loss calculation (based on offender gain), it offered no analysis of why that method was preferable. Therefore, none of the cases appellants cited suggest a reason for calculating loss based on offender gain rather than on intended loss, if the latter can be reasonably determined.

product of the prosecutor's misconduct.  Appellants' convictions are therefore AFFIRMED.

We VACATE Walton's and Sternisha's sentences, however, and REMAND their cases for resentencing consistent with this opinion.[19]

SO ORDERED.

---

[19] Thus, in resentencing Walton and Sternisha, the district court shall use, as a total offense level, level fifteen.